OPINION
{¶ 1} Defendant-appellant, Darrin S. Brodbeck, appeals from the judgment of the Franklin County Court of Common Pleas convicting him of one count of murder, one count of tampering with evidence, and one count of domestic violence. For the following reasons, we affirm.
 {¶ 2} On June 6, 2007, the Franklin County Grand Jury indicted appellant on one count of murder in violation of R.C. 2903.02, an unspecified felony, one count of tampering with evidence in violation of R.C. 2921.12, a third-degree felony, and one count *Page 2 
of domestic violence in violation of R.C. 2919.25, a fifth-degree felony. All three counts included firearm specifications pursuant to R.C. 2941.145.
 {¶ 3} Appellant voluntarily waived his right to a jury trial and elected to be tried by the court on the domestic violence count and the firearm specification. Thereafter, the case proceeded to a jury trial on the other counts, and the jury found appellant guilty of murder, tampering with evidence, and the firearm specifications. Following a hearing, the trial court found appellant guilty of domestic violence, but not guilty of the firearm specification. The trial court subsequently sentenced appellant in accordance with law.
 {¶ 4} Appellant timely appeals the trial court's judgment, advancing three assignments of error, as follows:
 I. The trial court erred and deprived appellant of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and Article One Section Sixteen of the Ohio Constitution by finding appellant guilty of murder, tampering with evidence and domestic violence as those verdicts were not supported by sufficient evidence and were also against the manifest weight of the evidence.
 II. Appellant's trial counsel was ineffective, thereby denying him his right to effective assistance of counsel as guaranteed by the Sixth
and Fourteenth Amendments to the United States Constitution and Article One, Section Ten of the Ohio Constitution.
 III. The trial court erred to the prejudice of appellant by admitting impermissible character evidence of the deceased, thereby depriving appellant of the right to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution and Article One Sections Ten and Sixteen of the Ohio Constitution.
 {¶ 5} Christine Turner and appellant, her boyfriend, lived together in Turner's home. At around midnight on June 9, 2006, Turner, appellant, and appellant's friend, Eric *Page 3 
Johnston, returned to the residence following an evening of drinking at a local bar. Turner telephoned two other friends, Mary Roberts and Bruce Thompson, and invited them to the house. The group drank beer, talked, and listened to music. At some point, Turner and appellant began arguing. According to Johnston, the argument involved "[l]ots of screaming, lots of yelling," but no physical contact and no threats of violence. (Tr. 93, 103.) Roberts testified that she and Thompson left when the shouting escalated.
 {¶ 6} The dispute between appellant and Turner eventually spilled into the backyard. At trial, Johnston testified that, at one point, Turner was on the ground; appellant picked her up and "kind of like push[ed]" her inside the house. (Tr. 97.) Johnston further testified that he urged appellant to calm down and "could have" yelled at him to leave Turner alone and not touch her. (Tr. 99.) When Johnston left the house between 2 and 3 a.m., Turner and appellant were still arguing.
 {¶ 7} The parties stipulated that appellant called 911 at 3:33 a.m. The transcript of the 911 call reveals that appellant reported that Turner had committed suicide by shooting herself in the head. The parties further stipulated that at 3:34 a.m., an unidentified neighbor called 911. The transcript of that 911 call indicates that the neighbor reported that a man was outside screaming that someone had been shot.
 {¶ 8} Patricia Hodas was staying at the home of her daughter, Jessica Bahl, who lived in the neighborhood. Hodas testified that she was awakened in the middle of the night by someone screaming outside. The screaming continued for about ten minutes, at which point she woke Bahl. Bahl told Hodas the noise was probably from a neighbor's party. Hodas then went back to bed. *Page 4 
 {¶ 9} A few minutes later, Hodas heard a man "begging for the life of a woman," screaming "please, don't hurt her. Please, don't hit her. Oh, my God. Oh, my God." (Tr. 136, 138, 143.) Hodas awakened Bahl, who called 911. The parties stipulated that Bahl called 911 at 3:36 a.m. The transcript of Bahl's 911 call reveals that she reported she and Hodas had heard a man screaming "no, no, please don't hit her, no no" (Tr. 122) and "oh God, oh God, please don't hurt her" (Tr. 124) for about ten minutes. Bahl also reported that she observed a man coming out of Turner's house yelling for help. (Tr. 123.) At trial, Bahl testified that during the 911 call, she heard someone wailing "oh God, oh God, please don't hurt her." (Tr. 120.) Hodas testified that as Bahl was talking to the 911 dispatcher, Hodas observed a man in the middle of the street screaming "oh, my God"; she also observed two other people running in and out of Turner's home. (Tr. 139.)
 {¶ 10} John Robinson, another neighbor, testified that he heard a man shouting "Oh, my god. Oh, my god." (Tr. 158.) Robinson went outside to investigate, and saw appellant pacing up and down the street. When Robinson inquired if there was a problem, appellant replied, "Chris just shot herself." (Tr. 158.)
 {¶ 11} Turner's mother, Joanne Klinglesmith, lived across the street from Turner and appellant. She testified that appellant came to her home and informed her that Turner was "dying." (Tr. 171.) Klinglesmith and her husband walked to Turner's home and found her dead on the floor in the hallway.
 {¶ 12} Columbus Police Officer John Kuntupis testified that he and his partner responded to the crime scene at 3:37 a.m. Appellant and Klinglesmith were standing on the front porch; appellant held a cordless telephone in his hand and had smeared, dried *Page 5 
blood on his forearms and hands. Officer Kuntupis entered the house and observed Turner on the floor; her left pant leg was ripped "all the way up." (Tr. 183.)
 {¶ 13} Appellant was transported to police headquarters at approximately 5 a.m. Columbus Police Department ("CPD") Crime Scene Search Unit ("CSSU") Detective Kevin Jackson testified that he took numerous photographs of appellant, which depicted bloodstains on appellant's arms, hands, face, pant legs and shoes, as well as abrasions on his face. Detective Jackson also collected appellant's clothing. Another CSSU detective collected gunshot residue from appellant's hands. Detective Jackson submitted the clothing and gunshot residue samples to the Ohio Bureau of Criminal Investigation and Identification ("BCI I") for analysis.
 {¶ 14} CSSU Detective William Snyder testified that he arrived at the crime scene at 8:19 a.m. on June 10, 2006. He prepared a diagram of the crime scene and took numerous photographs. The photographs depict drawers and debris scattered on the floor of the family room. One of the photographs (State's Exhibit 33) depicts what Detective Snyder characterized as a bloody "drag mark" on the carpet from the front bedroom into the hallway near Turner's body. Detective Snyder testified that the "drag mark" indicated that Turner's body had been moved. (Tr. 263.) The photographs also depict Turner's body on the hallway floor outside the door to the front bedroom; her right arm is extended outward with her right hand touching the grip of a bloodstained .357 magnum revolver.
 {¶ 15} CPD Detective Daniel McGahhey testified that he and Detective Larry Brown conducted a videotaped interview of appellant at 10:13 a.m. on June 10, 2006. The DVD and transcript of the interview reveal the following. Appellant stated that he and *Page 6 
Turner had dated for about eight months and lived together for approximately seven months. Appellant characterized their relationship as "wonderful" and described himself and Turner as the "ideal couple." (Interview Tr. 15.) Appellant admitted, however, that he and Turner sometimes argued over finances.
 {¶ 16} Regarding the events of June 9 and 10, 2006, appellant stated that he, Turner and his friend, Eric Johnston, were drinking at a neighborhood bar until approximately 1 a.m; appellant drank six beers and one shot of liquor. As the three were leaving the bar, they met two other friends; the five decided to go to Turner's home and hang out. Sometime between 1:30 and 2 a.m., he and Turner went outside and got into a "small spat" about asking their friends to leave. (Id. Tr. 30.) The three friends eventually left, leaving appellant and Turner alone. Their argument intensified, and, at one point, Turner tried to walk away from appellant; he stepped in front of her, and she "swiped" at him to get away. (Id. Tr. 42.) In response, he grabbed at a tear in the pocket of her jeans and ripped the back of her jeans completely off.
 {¶ 17} Eventually, the two went inside the house and continued to argue. Turner stated that she felt like she could not please him and began throwing objects off the bar in the family room. Appellant ripped up a photograph of the two of them. Turner told appellant she wanted to spend the night at her mother's; appellant discouraged her from doing so due to the late hour and his reluctance to involve her mother in such a "small argument." (Id. Tr. 34.)
 {¶ 18} The argument eventually moved into the front bedroom. Turner retrieved the gun she kept under the mattress and stood in the doorway of the bedroom. She began waving the gun erratically, at one point brandishing the gun in appellant's direction. *Page 7 
Appellant stated that he was "scared to death when she was waving the gun" and urged her to put it down. (Id. Tr. 52.) Turner continued to wave the gun wildly and asked appellant, "would you be happy if I was just not here or if I shot myself[?]" (Id. Tr. 35.) Appellant noticed that the gun's hammer was cocked back; the "next thing [he knew] she was on the floor." Id. He bent down and put his arm under the back of her neck to cradle her, at which point he noticed her massive head wound. He called 911 and ran screaming to Klinglesmith's house. Appellant stated that he did not think Turner shot herself intentionally; rather, he believed she "was doing it to scare me to say, you know, what else can I do to please you or what else do I have to do?" Id.
 {¶ 19} Appellant adamantly rejected the detectives' intimations that he struck Turner during the argument. He further denied suggestions that the gun either discharged in the process of appellant trying to wrestle it away from Turner or that appellant, knowing that Turner kept the gun under the mattress, retrieved the gun during the argument, shot Turner at close range, and then repositioned her body and the gun to simulate a suicide. Indeed, appellant insisted that he never touched the gun and was standing several feet from Turner when the gun discharged. He further denied that he dragged her body from the hallway into the bedroom or that he repositioned the gun so that it was adjacent to her hand. He admitted that he may have pushed the gun away from Turner's body as he attempted to put his arm under her neck after the shooting. He further admitted that the fight was "huge" — the worst he and Turner had ever had. (Id. Tr. 72.)
 {¶ 20} Dr. Joseph Ohr, a forensic pathologist employed by the Franklin County Coroner's Office, testified that he performed an autopsy on June 12, 2006, after viewing *Page 8 
the crime scene on June 11, 2006. Dr. Ohr opined that Turner suffered a "devastating" gunshot wound to her head (Tr. 306), which would have caused her to drop to the floor immediately with no further voluntary movement possible. (Tr. 355.) Dr. Ohr described the entrance wound as a star-shaped contact gunshot wound on the right temple region of the head midway between the ear and the eye; the pathway of the bullet was from right to left, front to back, and slightly upward.
 {¶ 21} Dr. Ohr took several photographs during the autopsy. Of note, one of the photographs depicts a contusion on the top of Turner's left foot which, according to Dr. Ohr, had been inflicted within hours of her death. Several other photographs depict contusions on Turner's upper and lower back, right and left thighs, right leg, and left knee; however, Dr. Ohr was unable to determine the cause or age of these contusions. In addition, several of the photographs depict the gunshot wound, which, according to Dr. Ohr, was inflicted when the gun barrel was in contact with Turner's scalp. He further opined that Turner was standing in the hallway just outside the front bedroom when the shot was fired.
 {¶ 22} Dr. Ohr determined that Turner was intoxicated at the time of her death and had also ingested cocaine prior to her death. He opined that Turner's intoxication and cocaine ingestion could have had an "unstabilizing" effect on her mood, emotions and judgment. (Tr. 315.)
 {¶ 23} Dr. Ohr reviewed the crime scene photographs prior to trial. He noted that one photograph, State's Exhibit 92, depicted blood on Turner's left foot; however, there was no blood on the carpet in the area around it. (State's Exhibit 30.) In addition, Dr. Ohr testified that the U-shaped bloodstain pattern depicted in State's Exhibit 33 was not *Page 9 
inconsistent with Turner having been dragged from the hallway to the front bedroom and back again.
 {¶ 24} Dr. Ohr opined that the cause of Turner's death was a gunshot wound to the head; however, he could not determine the manner of death. More particularly, Dr. Ohr opined that the gunshot wound could have been self-inflicted or inflicted by someone else.
 {¶ 25} CPD criminalist Mark Hardy testified that he examined the gun found at the crime scene and determined that it was operable and had been fired. According to Hardy, the gun had a "hammer block safety" which prevents the gun from firing unless sufficient pressure is exerted on the trigger; firing the gun single action (with the hammer cocked back) would require four and one-half pounds of trigger pressure. (Tr. 278.)
 {¶ 26} Ted Manasian, a forensic scientist employed by BCI I, testified that he examined the gunshot residue samples submitted by CSSU and issued a report of his findings. (State's Exhibit E-5.) That report indicates that gunshot residue was present on appellant's left hand. The report further notes that the presence of gunshot residue on an individual's hands is consistent with that individual having discharged a firearm, having been in the vicinity of a firearm when it was discharged, or having handled an item with gunshot residue on it. According to Manasian, the fact that an individual has gunshot residue on his or her hands does not definitively indicate that the individual fired a weapon.
 {¶ 27} Robert Young, a retired CPD homicide detective and stipulated bloodstain evidence expert, testified that he examined the crime scene at CPD's request in mid-August 2006, reviewed the evidence amassed by the police, particularly the crime scene *Page 10 
photographs, interviewed Dr. Ohr, and prepared a report of his findings. According to Young, Dr. Ohr opined that after Turner was shot, she would have moved "little to not at all once she dropped." (Tr. 483.)
 {¶ 28} Upon review of the evidence, Young could not conclude to a reasonable degree of scientific certainty whether Turner's death was the result of a homicide or a suicide. (Tr. 488.) Indeed, Young testified that the evidence was "not inconsistent with either possibility." (Tr. 546.) However, Young opined that Turner was standing in the hallway just outside the front bedroom door at the time the shot was fired. (Tr. 498-500; 508-509.) He further opined, based upon high-velocity blood spatter on appellant's pants and shoes, that appellant was within four feet of Turner when the shot was fired.
 {¶ 29} Young further opined that the gun was fired while in contact with the skin in Turner's right temporal area. (Tr. 500-501.) He further testified that the U-shaped "swiped transfer drag pattern" depicted in State's Exhibit 33 was "made as a result of the back of [Turner's] bleeding head coming into contact with the carpet as she was dragged along the carpet and brought back to where she was originally shot." (Tr. 520-521.) Young noted that the wound at the back of Turner's head was consistent with the width of the U-shaped pattern. (Tr. 520.) Young further opined that bloodstains on Turner's upper arms and the absence of bloodstains on her shoulders indicated that her upper arms were extended upward, as if she was being "moved, repositioned, or dragged," and came in contact with her blood-soaked hair and scalp. (Tr. 515-517.) According to Young, the minimal amount of blood on the floor under Turner's arms established "that she was in some other position at the time that this hair transfer pattern was created on the outside of her shoulders." (Tr. 516.) *Page 11 
 {¶ 30} Young further noted that blood on the top of Turner's left foot and the absence of blood on the floor under it indicated that Turner was "repositioned about the scene." (Tr. 510.) More particularly, Young testified that the blood on her foot resulted from "her head being bent forward and blood being able to flow onto that area and drip when that foot is still in close contact with the floor in some other area." (Tr. 511-512.) Young further noted a transfer stain on the back of Turner's right ankle, which "likely [occurred] where the ankle came into contact with a blood covered object." (Tr. 512.) He opined that because there was no blood on the floor under Turner's right ankle, "[t]his could have occurred during repositioning or it would have occurred when a person with blood covered hands grabbed her ankle." (Tr. 512.) Young also noted that the fact that Turner's jeans were "pulled down somewhat" was consistent with "someone pulling on her leg during a repositioning." (Tr. 525.)
 {¶ 31} In addition, Young testified that "[i]f one concludes that [Turner] was, in fact, dragged from the hallway to the bedroom and back * * * one must further reach the conclusion that her hand was repositioned at the base of the grip of the gun." (Tr. 522.) Young noted that the position of Turner's right hand, away from her body and near the gun, was inconsistent with appellant's claim that he lifted or scooped her up to cradle her. More particularly, Young testified that if Turner's right arm was extended when appellant cradled her, it would have retracted when he set her down; it would not have extended as depicted in the crime scene photographs.
 {¶ 32} Young also opined that a "saturating transfer pattern" on Turner's lap area "could not have been created" at the moment she received the gunshot injury. (Tr. 513-514.) Rather, it "occurred at some point when [Turner's] head was * * * positioned * * * *Page 12 
over her jeans and [lap] area and blood was permitted to flow from her head and hair onto her [lap]." (Tr. 514.) Young acknowledged that appellant's cradling of Turner could have accounted for this bloodstain; however, he noted that given the amount of blood on Turner's lap, such cradling would have had to occur for "quite some time." (Tr. 515.)
 {¶ 33} On cross-examination, Young admitted that, assuming appellant shot Turner, appellant could not have moved his hand away fast enough to avoid high-velocity blood spatter. He further testified that 19 small spots of blood on appellant's wrist and forearm were not high-velocity blood spatter, and there was no high-velocity blood spatter on appellant's hands or shirt. However, Young stated that, based upon appellant's statement in his interview that he cradled Turner in his arms and that the photographs of appellant at the police station were taken more than an hour after Turner was shot, any high-velocity blood spatter could have been altered. As such, he could not draw any conclusion about the fact that no high-velocity blood spatter was on appellant's hands. (Tr. 578.) Young acknowledged, however, that the presence of high-velocity blood spatter on Turner could indicate that she shot herself.
 {¶ 34} Gene Gietzen, an expert in blood-spatter analysis, testified on behalf of appellant. Gietzen stated that he reviewed the evidence collected by the police, including the crime scene photographs; he also took measurements of pertinent aspects of the crime scene and prepared a scale model. From his review of these materials, he could not conclusively determine precisely where Turner was standing at the time of the gunshot; however, he could determine that she was in the hallway.
 {¶ 35} Gietzen characterized the U-shaped bloodstain on the bedroom carpet as "very perplexing." (Tr. 682.) He noted that the bloodstain appeared to be a "drag mark"; *Page 13 
however, he could not determine to a reasonable degree of scientific certainty the means by which the bloodstain was deposited. (Tr. 683, 686.) In particular, he testified that the evisceration of Turner's skull and brain material would have caused her hair to be blood soaked and that dragging her blood-soaked hair would have formed a unique pattern including "almost like a paint bristle type streaks adjoining a drag mark." (Tr. 684.) Gietzen noted that the bloodstain pattern at issue was a "flat symmetrical drag mark" which was "not consistent with the victim's head being drug in that direction" due to the lack of "individual streaks." Id. He further testified that the absence of blood spatter "in the form of the heavy viscous blood you see emanating from [Turner's] head on the carpeting in the hallway or bedroom" indicated that Turner's body was not moved into the front bedroom after she was shot. (Tr. 691.) He further noted that there were no bloody footprints in the hallway or bedroom and no viscous blood, skull fragments, brain tissue or high-velocity blood spatter on appellant's shirt, pants, right arm, or shoes. He stated, however, that he did not "feel comfortable" opining as to what type of blood spatter one would expect to see on the hands, arms, clothing, face, or body of the person who fired a .357 magnum weapon. (Tr. 700.) On cross-examination, Gietzen acknowledged that the U-shaped bloodstain pattern was not created by high-velocity blood spatter, a bloody footprint, or blood dropping on the carpet.
 {¶ 36} Appellant's first assignment of error challenges the weight and sufficiency of the evidence supporting his convictions for murder and tampering with evidence.[1] "The legal concepts of sufficiency of the evidence and weight of the evidence are both *Page 14 
quantitatively and qualitatively different." State v. Thompkins (1997),78 Ohio St.3d 380, paragraph two of the syllabus. Accordingly, we shall separately discuss the standard of review applicable to each.
 {¶ 37} In State v. Jenks (1991), 61 Ohio St.3d 259, the Supreme Court of Ohio held that "[a]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." Id. at paragraph two of the syllabus. The court further held that "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id.
 {¶ 38} Whether the evidence is legally sufficient to sustain a verdict is a question of law, not fact. Thompkins, supra, at 386. In determining the sufficiency of the evidence, an appellate court must give "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson v. Virginia
(1979), 443 U.S. 307, 319, 99 S.Ct. 2781. Accordingly, evaluation of witness credibility is not proper on review for evidentiary sufficiency.State v. Yarbrough, 95 Ohio St.3d 227, 2002-Ohio-2126, at ¶ 79. An appellate court may not disturb a jury verdict unless, after viewing the evidence in a light most favorable to the prosecution, the court finds that reasonable minds could not reach the conclusion reached by the trier of fact. State v. Treesh (2001), 90 Ohio St.3d 460, 484. *Page 15 
 {¶ 39} With these parameters in mind, we shall first examine whether the state presented sufficient evidence to support appellant's conviction for murder. R.C. 2903.02(A) provides, in relevant part, that "[n]o person shall purposely cause the death of another." R.C. 2901.22(A) defines "purposely" as follows: "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." In determining whether an accused acted purposely, "[a] defendant's state of mind may be inferred from the totality of the surrounding circumstances." State v. Sullivan, Medina App. No. 07CA0076-M,2008-Ohio-2390, at ¶ 10, quoting State v. Harper (Mar. 29, 2000), Summit App. No. 19632.
 {¶ 40} The state presented evidence that appellant and Turner engaged in a lengthy, intense, physical argument immediately prior to Turner's death. Johnston testified that the argument involved "lots of screaming, lots of yelling" (Tr. 93), and that he observed appellant push Turner. Johnston also testified that he urged appellant to calm down and implored him to leave Turner alone. Roberts testified that she and Thompson left Turner's house when the argument intensified. Crime scene photographs depict drawers and other objects strewn about the family room. In his interview with the police, appellant admitted that he drank six beers and one shot of liquor prior to the argument. Although he initially attempted to downplay the dispute, characterizing it as a "small spat" and a "small argument," he later acknowledged that it was the worst fight he and Turner had ever had. He also admitted that the argument ultimately became physical; when he tried to block Turner's pathway, she "swiped" at him, and, in response, he ripped an entire *Page 16 
pant leg from Turner's jeans. Photographs of appellant taken after the shooting depict abrasions on his face. Dr. Ohr testified that the autopsy revealed a contusion on Turner's left foot that had been inflicted within hours of her death. The fact that appellant and Turner were involved in a prolonged, physical, alcohol-fueled dispute could provide a possible motive for appellant to purposely shoot Turner.
 {¶ 41} Further, the state presented physical evidence that does not conform to the account of the shooting appellant provided in his interview with the police. Appellant stated that Turner was waving the gun around erratically and threatening to commit suicide when "the next thing [he knew] she was on the floor." (Interview Tr. 35.) He further stated that he did not think Turner intended to shoot herself; rather, she was waving the gun around in order to scare him. The DVD of the interview depicts appellant simulating Turner's gestures by waving his hand in the air as if it were a gun.
 {¶ 42} As the state points out, however, conspicuously absent from appellant's description of the shooting is any mention of Turner placing the gun directly to her head immediately prior to the gunshot. Further, the DVD of the interview does not depict appellant putting his hand up to his head when simulating the shooting. As noted by the state, this omission is significant, as both Dr. Ohr and Young testified that the gun was in contact with Turner's head when the shot was fired. The jury could reasonably conclude that appellant would not forget or omit this key fact.
 {¶ 43} Casting further doubt on appellant's account of the shooting is the fact that the gun was equipped with a "hammer lock safety," which ensures that the gun does not fire unless the trigger is pulled with sufficient pressure. Appellant stated that he observed the gun's hammer cocked back; as noted by Hardy, in such a circumstance, the gun *Page 17 
would require four and one-half pounds of trigger pull for it to fire. This evidence suggests that the shooting was not accidental. State v.Freeman, Franklin App. No. 07AP-337, 2007-Ohio-6859, at ¶ 23 (jury could have rejected claim of accidental shooting based upon testimony that the gun required six and one-half pounds of force applied to the trigger to cause it to fire, that the gun would have to have had the magazine inserted, a round chambered, and the safety off). Further, appellant admitted that Turner had never before acted "recklessly" with the gun. (Interview Tr. 69.)
 {¶ 44} Thus, the jury could have reasonably concluded that appellant fabricated the story that the gun suddenly "went off" as Turner was "erratically" waving it around. (Id. Tr. 76.) The jury was at liberty to infer consciousness of guilt from appellant's lie. State v.Williams, 99 Ohio St.3d 493, 2003-Ohio-4396, at ¶ 54, citing State v.Johnson (1989), 46 Ohio St.3d 96, 100. "The law is clear that lies told by an accused are admissible evidence of consciousness of guilt, and thus of guilt itself." State v. Robinson, Lucas App. No. L-06-1182,2008-Ohio-3498, at ¶ 202.
 {¶ 45} Moreover, appellant's conduct after the shooting provides further evidence of a purposeful killing. In his interview with the police, appellant denied that he dragged Turner's body from the hallway into the front bedroom. However, the physical evidence belies appellant's contention. Young, noting that the width of the U-shaped bloodstain on the carpet in the bedroom/hallway area was consistent with the wound at the back of Turner's head, opined that the bloodstain resulted from Turner's bleeding head being dragged along the carpet. Dr. Ohr also testified that the U-shaped bloodstain was not inconsistent with Turner having been dragged across the carpet. However, Dr. Ohr testified that Turner's gunshot wound would have caused her to drop to the floor *Page 18 
immediately, with no further voluntary movement possible. Young testified that Dr. Ohr reported to him that Turner would have moved "little to not at all once she dropped" to the floor after the shooting. (Tr. 483.) In addition, appellant told the police that Turner "dropped" to the floor after the gunshot and did not indicate that Turner made any voluntary movements thereafter. (Interview Tr. 51.) This evidence establishes that Turner could not, and did not, drag herself across the carpet after being shot. The jury could thus conclude that appellant, the only other person present at the time of the shooting, dragged Turner's body after the shot was fired.
 {¶ 46} Moreover, bloodstains on Turner's body corroborated the fact that appellant dragged Turner's body after the shooting. In particular, Young testified that bloodstains on Turner's upper arms and the absence of bloodstains on her shoulders indicated that her upper arms were extended upward as if she was being moved, repositioned or dragged. Young further indicated that bloodstains of her left foot and right ankle, along with the fact that her jeans were pulled slightly down, were consistent with her being dragged.
 {¶ 47} In addition, Young testified that if appellant dragged Turner from the hallway where she was shot into the front bedroom and back again, appellant also purposely repositioned her right hand near the gun. Young noted that the position of Turner's right hand was inconsistent with appellant's claim that he lifted her up to cradle her. Indeed, Young stated that, if appellant had done so, when he laid her down her arm would not have extended outward as pictured in the crime scene photographs; rather, it would have retracted by her side. *Page 19 
 {¶ 48} Evidence that appellant dragged Turner's body and repositioned her hand near the gun is significant in establishing that appellant murdered Turner. "[Attempts to alter or destroy evidence * * * can serve as admissions by conduct of a consciousness of guilt." State v.Brown (July 28, 1988), Cuyahoga App. No. 52593. Moreover, the fact that appellant lied to the police about his attempts to alter evidence likewise demonstrates consciousness of guilt. Williams, supra.
 {¶ 49} In light of the foregoing, we find that the state produced sufficient evidence that, if believed, would convince the average mind beyond a reasonable doubt that appellant purposely caused Turner's death.
 {¶ 50} We next address whether the state presented sufficient evidence to support appellant's conviction for tampering with evidence. R.C. 2921.12(A)(1) provides that "[n]o person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]"
 {¶ 51} Given that the evidence noted above established that appellant placed a gun in contact with Turner's head and shot her, the jury could have reasonably inferred that he was aware that an investigation was likely to begin. "When an offender commits an unmistakable crime, the offender has constructive knowledge of an impending investigation of the crime committed." State v. Schmitz, Franklin App. No. 05AP-200,2005-Ohio-6617, at ¶ 17, citing State v. Cockroft, Franklin App. No. 04AP-608, 2005-Ohio-748, at ¶ 11 and State v. Jones, Franklin App. No. 02AP-1390, 2003-Ohio-5994, at ¶ 35. Further, given that the evidence established that appellant dragged Turner's body and *Page 20 
repositioned the gun near her hand in an apparent effort to simulate a suicide, the jury could have reasonably inferred that appellant altered the crime scene with purpose to impair law enforcement efforts to investigate the shooting.
 {¶ 52} In light of the foregoing, we find that the state produced sufficient evidence that, if believed, would convince the average mind beyond a reasonable doubt that appellant tampered with evidence.
 {¶ 53} Having determined that appellant's convictions for murder and tampering with evidence are supported by sufficient evidence, we shall next examine appellant's claim that his convictions are against the manifest weight of the evidence. An appellate court evaluates a manifest-weight argument under a different standard than that employed in a sufficiency analysis. "`The weight of the evidence concerns the inclination of the greater amount of credible evidence offered in a trial to support one side of the issue rather than the other.'"State v. Gray (Mar. 28, 2000), Franklin App. No. 99AP-666, quotingState v. Buterbaugh (Sept. 16, 1999), Franklin App. No. 98AP-1093. In order for an appellate court to reverse the judgment of a trial court on manifest-weight grounds, the appellate court must unanimously disagree with the jury's resolution of the conflicting evidence.Thompkins, supra, at 387. In a manifest-weight review, the court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Thompkins, supra. The discretionary power to reverse on manifest-weight grounds should be exercised only in *Page 21 
the exceptional case in which "the evidence weighs heavily against the conviction." Id., quoting State v. Martin (1983), 20 Ohio App.3d 172,175.
 {¶ 54} Appellant's manifest-weight claim focuses first on the apparent inconsistencies in the 911 calls and the testimony related to those calls. Appellant notes that the stipulated evidence established that he called 911 at 3:33 a.m. and reported Turner's death. Appellant further notes that the stipulated evidence established that Bahl called 911 at 3:36 a.m. and that she testified at trial that during the 911 call she heard someone yelling "oh God, oh God, please don't hurt her." (Tr. 120.) Appellant argues that Bahl's testimony is inconsistent with the timing of the 911 calls because there would be no reason for anyone to be screaming "please don't hurt her" after Turner was already dead.
 {¶ 55} An accused is not entitled to a reversal on manifest-weight grounds merely because inconsistent evidence was presented at trial.State v. Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21. "`While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render [a] conviction against the manifest weight * * * of the evidence.'" Id., quoting State v. Nivens (May 28, 1996), Franklin App. No. 95APA09-1236. A jury, as trier of fact, is free to believe all, part, or none of the testimony of the witnesses who appear before it. Id, citing State v.Antill (1964), 176 Ohio St. 61, 67. Consequently, although an appellate court must act as a "thirteenth juror" when considering whether the manifest weight of the evidence requires reversal, it must also give great deference to the jury's determination of witness credibility.State v. Covington, Franklin App. No. 02AP-245, 2002-Ohio-7037, at ¶ 28. *Page 22 
 {¶ 56} Thus, inconsistencies between Bahl's testimony and the 911 calls were the jury's to resolve. The jury could reasonably conclude that Bahl was mistaken in her testimony about the timing of the "please don't hurt her" statements. Moreover, the jury may have assigned little or no weight to the sequence of the 911 calls and/or any of the testimony related to them. Upon review of the entire trial transcript, we find that the 911 calls and the related testimony were relatively minor and rather insignificant portions of evidence upon which the state relied to demonstrate that appellant was guilty of the charged offenses. The jury could thus reasonably conclude that the state's evidence, even without the 911 calls, established that appellant purposely shot and killed Turner and then repositioned her body to simulate a suicide.
 {¶ 57} Appellant also argues that his convictions are against the manifest weight of the evidence because both Dr. Ohr and Young testified that they could not definitively determine whether Turner's death resulted from murder or suicide or whether appellant had repositioned Turner's body. Although neither expert could opine as to the ultimate question of the manner of Turner's death, their testimonies, along with the other evidence offered at trial, including appellant's police interview, allowed the jury to decide for itself that appellant murdered Turner and thereafter altered the crime scene.
 {¶ 58} In short, the jury had the opportunity to hear the testimony of all the witnesses who appeared before it and evaluate their credibility. A reviewing court may not substitute its judgment for that of the jury unless it is manifestly clear that the jury lost its way. State v.Green, Franklin App. No. 03AP-813, 2004-Ohio-3697, at ¶ 25, citingState v. Williams, Montgomery App. No. 20039, 2004-Ohio-1939, at ¶ 14. After reviewing the entire record, weighing the evidence and all reasonable inferences, and considering *Page 23 
the credibility of witnesses, we cannot conclude that the jury lost its way and created a manifest miscarriage of justice in arriving at its verdicts. To the contrary, we conclude that the weight of the evidence supports the convictions.
 {¶ 59} Having determined that appellant's convictions for murder and tampering with evidence are supported by sufficient evidence and are not against the manifest weight of the evidence, we overrule appellant's first assignment of error.
 {¶ 60} Appellant's second assignment of error contends he received ineffective assistance of counsel at trial. The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel. An accused bears the burden of demonstrating ineffective assistance of counsel. State v. Smith (1985),17 Ohio St. 98, 100. To prevail on his ineffective assistance of counsel claim, appellant must meet the two-prong test enunciated inStrickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052. Initially, appellant must demonstrate that trial counsel's performance was deficient. Id. at 687. To meet that requirement, appellant must show that counsel's errors were so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Id. Appellant may prove counsel's conduct was deficient by identifying acts or omissions that did not result from reasonable professional judgment. Id. at 690. We must then determine whether, in light of all circumstances, the identified acts or omissions were outside the range of professionally competent assistance. Id. There is a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance. Id. at 689. Appellant must overcome the presumption that, under the circumstances, the challenged action might be *Page 24 
considered sound trial strategy. Id., citing Michel v. Louisiana (1955),350 U.S. 91, 100, 76 S.Ct. 158.
 {¶ 61} The second prong of the Strickland test requires appellant to prove that counsel's deficient performance prejudiced him. Id. at 692. This requires appellant to demonstrate that counsel's errors were so serious as to deprive him of a fair trial, a trial whose result is reliable. Id. at 687. Appellant would meet this standard with a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.
 {¶ 62} Appellant contends counsel was ineffective in failing to: (1) investigate certain aspects of the physical evidence, and (2) cross-examine the state's witnesses about this physical evidence. In support of his contention, appellant refers to the report Dr. Ohr prepared in conjunction with the autopsy. In that report, Dr. Ohr stated that the contact gunshot wound suffered by Turner caused two portions of her brain to be eviscerated from the skull; a third portion remained inside her skull. The report listed one of the eviscerated portions as being discovered under Turner's body and the other eviscerated portion as being found near her body. Appellant contends counsel was ineffective in failing to investigate whether the portion of the brain found under Turner's body exhibited signs of injury or trauma resulting from her body being dragged over it. Appellant argues that the absence of injury or trauma to the brain segment would serve to undermine the state's theory that appellant dragged Turner's body after the shooting. Appellant further contends counsel was ineffective in failing to cross-examine Dr. Ohr about this aspect of his report, in failing to cross-examine Young about his failure to *Page 25 
account for this issue in his report or testimony, and in failing to question Detective McGahhey about this evidence.
 {¶ 63} As the state points out, appellant mistakenly asserts that the autopsy report was admitted at trial. Although the report was identified and is included in the record, the state expressly chose not to admit it into evidence. Further, there is no evidence in the record establishing that counsel overlooked this aspect of the autopsy report or that counsel failed to investigate the import of this physical evidence. Counsel may well have investigated the issue, ascertained that the brain segment had suffered injury or trauma as a result of Turner's body being dragged over it, and concluded that the evidence would have enhanced the state's case. Alternatively, counsel may have investigated the issue and concluded that the evidence was of no particular import to either appellant's or the state's case.
 {¶ 64} In a direct appeal, this court's review is limited to evidence presented at trial, and we cannot consider matters outside the record before us. Columbus v. Brown, Franklin App. No. 05AP-344,2005-Ohio-6102, at ¶ 9, citing State v. Ishmail (1978),54 Ohio St.2d 402, paragraph one of the syllabus. Where an appellant's claim of ineffective assistance of counsel is based upon facts not in the record, the appropriate remedy is a petition for postconviction relief, not direct appeal. State v. Cooperrider (1983), 4 Ohio St.3d. 226, 228. Because we refrain from adjudicating that part of appellant's claim which is based upon facts that are not contained in the record before us, the doctrine of res judicata will not prevent appellant from raising the issue of ineffective assistance of counsel in a hearing for postconviction relief. Id. at 228-229. Therefore, appellant may *Page 26 
petition for a postconviction evidentiary hearing to develop a record upon which his claims of counsel's failure to investigate may be properly addressed.
 {¶ 65} Further, as to appellant's contention that counsel was ineffective in failing to cross-examine the state's witnesses, we note initially that "[t]he extent and scope of cross-examination clearly fall within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." State v. Leonard,104 Ohio St.3d 54, 2004-Ohio-6235, at ¶ 146. "[A]n appellate court reviewing an ineffective assistance of counsel claim must not scrutinize counsel's strategic decision to engage, or not engage, in a particular line of questioning on cross-examination." State v. Dorsey, Franklin App. No. 04AP-737, 2005-Ohio-2334, at ¶ 22, quoting In re Brooks, Franklin App. No. 04AP-164, 2004-Ohio-3887, at ¶ 40. Appellant's contention that cross-examination regarding the location of the brain segment at issue would have aided his case is purely speculative. Counsel may have decided to forgo cross-examination to avoid the danger of underscoring the merits of the state's case and clarifying testimony, particularly from Dr. Ohr, that may not have benefited appellant. In fact, the decision not to cross-examine the state's witnesses on this issue may well demonstrate counsel's competence and skill. Accordingly, we find that counsel's decision to forgo cross-examination constituted a legitimate tactical decision. Id.
 {¶ 66} For these reasons, we cannot conclude that appellant was denied the effective assistance of counsel. Accordingly, we overrule appellant's second assignment of error.
 {¶ 67} Appellant's third assignment of error contends the trial court erred in admitting favorable character evidence about Turner in violation of Evid. R. 404(A) and his *Page 27 
right to a fair trial. Appellant maintains the state offered this evidence to evoke the passion and emotion of the jury because it realized the physical evidence was weak and inconclusive.
 {¶ 68} The admission of evidence lies within the broad discretion of the trial court, and a reviewing court may not disturb an evidentiary ruling absent an abuse of discretion. State v. Myers, 97 Ohio St.3d 335,2002-Ohio-6658, at ¶ 75. "An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude was unreasonable, arbitrary, or unconscionable." Id., citing State v.Adams (1980), 62 Ohio St.2d 151, 157.
 {¶ 69} The state called Turner's father, Jack Turner, as its first witness in its casein-chief. Mr. Turner testified that Turner had many friends and no enemies. He further testified that she owned her own home, was very athletic, enjoyed traveling, loved animals, and was an avid Ohio State football fan. Defense counsel did not object to this testimony. Indeed, he expressly stated that he would not object to this introductory, "getting to know her," testimony. (Tr. 61-62.)
 {¶ 70} Accordingly, appellant has waived this issue unless he can demonstrate plain error. State v. Hale, 119 Ohio St.3d 118,2008-Ohio-3426, at ¶ 52. An alleged error amounts to plain error only if the error is "obvious" and "`but for the error, the outcome of the trial clearly would have been otherwise.'" Id., quoting, respectively,State v. Sanders (2001), 92 Ohio St.3d 245, 257, and State v. Long
(1978), 53 Ohio St.2d 91, paragraph two of the syllabus.
 {¶ 71} No plain error occurred here. Contrary to appellant's assertion, the challenged testimony does not constitute improper victim character evidence under *Page 28 
Evid. R. 404(A). As the Supreme Court of Ohio has observed, "`proving the facts of a murder necessarily involves disclosure of details as to the victims and their lives. "The victims cannot be separated from the crime." `"State v. Johnson, 112 Ohio St.3d 210, 2006-Ohio-6404, at ¶ 230, quoting State v. Smith (1997), 80 Ohio St.3d 89, 107, quotingState v. Lorraine (1993), 66 Ohio St.3d 414, 420. Moreover, background information about a murder victim is admissible to identify the victim as a living person. This type of evidence "simply establishes] that the [victim] had been [a] living person[ ], an element of the * * * murder charge." Id. at ¶ 229, quoting State v. Noling, 98 Ohio St.3d 44,2002-Ohio-7044, at ¶ 55-57. Moreover, Mr. Turner's testimony regarding Turner's positive relationships and numerous interests also aided in rebutting appellant's contention that Turner committed suicide by shooting herself in the head. See State v. McKnight, 107 Ohio St.3d 101,2005-Ohio-6046, at ¶ 100 (testimony about murder victim's upbeat mood before her disappearance, her strong religious beliefs, and her aspirations to become an Episcopal priest admissible in rebutting arguments that victim may have committed suicide). Further, as inSmith, supra, Mr. Turner's testimony regarding his daughter's background was a relatively minor and innocuous portion of the evidence the state presented against appellant.
 {¶ 72} Finally, we note that the trial court instructed the jury to decide the case upon the evidence and not upon bias, sympathy and emotion. It is well-settled that the jury is presumed to follow the trial court's instructions. State v. Hancock, 108 Ohio St.3d 57,2006-Ohio-160, at ¶ 86, citing State v. Fears (1999), 86 Ohio St.3d 329,334. For the foregoing reasons, we overrule appellant's third assignment of error. *Page 29 
 {¶ 73} Having overruled appellant's first, second, and third assignments of error,
we hereby affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
McGRATH, P.J., and FRENCH, J., concur.
 T. BRYANT, J., retired of the Third Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
[1] Although the assignment of error itself challenges all of appellant's convictions, the argument under this assignment of error focuses only upon appellant's convictions for murder and tampering with evidence. *Page 1