OPINION
{¶ 1} Defendant-appellant, Julius O. Whiteside ("appellant"), appeals from the judgment of the Franklin County Court of Common Pleas convicting him of voluntary manslaughter with specification, a first-degree felony, in violation of R.C. 2903.03.
 {¶ 2} The charges herein arise out of the shooting death of Jaron Armstrong ("Armstrong"), that occurred on September 15, 2005, at approximately 1:00 a.m. During the trial, the jury heard testimony from 17 witnesses and the following factual scenario is taken from the same. *Page 2 
 {¶ 3} Early in the day of September 14, 2005, Erika Lewis ("Lewis"), who had ended a relationship with Armstrong, was walking down the street in the area of the Franklin County Courthouse with her friend, Donee Peterson ("Peterson"), and Peterson's son. Appellant called out to Lewis that she would "look cute in some Apple Bottom jeans." (Tr. 509.) Appellant, who was with two other men, introduced himself as "Nut." Appellant and Lewis exchanged "chirp" and cell phone numbers. Peterson and Lewis then proceeded to a job fair at Nationwide Arena and afterwards went to a Wendy's restaurant. Appellant "chirped" Lewis and later gave Lewis and Peterson a ride in his pickup truck to Lewis's apartment at the Nelson Park Apartments at 1964 Maryland Avenue, in Columbus, Ohio.
 {¶ 4} Appellant returned to Lewis's apartment later that day and took her to a McDonald's restaurant. Appellant left again, but Lewis later "chirped" appellant to see if he could get some marijuana for her. Appellant agreed to, and they met at a house off of Fifth Avenue. After obtaining some marijuana and smoking some at the house off Fifth Avenue, Lewis returned home. Lewis was preparing for bed when appellant "chirped" and asked her if she wanted some company. Lewis allowed appellant to come over, and once inside, appellant told Lewis his cousin and uncle were also outside. Appellant asked Lewis if they could come in as well, and Lewis allowed them into her apartment. Lewis testified that appellant was driving the same truck as he had earlier that day.
 {¶ 5} Once appellant and the two other men were inside the apartment, Wonquet Reeves ("Reeves"), and Synneatra Lovett ("Lovett"), who were residents of the apartment complex, came over to Lewis's apartment. According to the women, on his lap, appellant had a gun, described as a revolver, that he later placed in his back pocket. While *Page 3 
appellant and the three women were in Lewis's kitchen, Armstrong rode by on a bicycle and said something that they were not able to hear. Armstrong rode by again and this time said something to the effect of coming back and shooting up Lewis's apartment. Lewis told appellant to disregard Armstrong's comments, but appellant went into the living room, said something to the other two men, and then all three went outside. Lewis called them back into the apartment, but then the men exited the back door. While the men appeared to be leaving, appellant walked the other way as Armstrong was then approaching.
 {¶ 6} Appellant and Armstrong talked for a few minutes and though no one appeared to be yelling, appellant kept his hand in his back pocket where the gun was. The two men separated, and Armstrong walked in the direction of his sister's apartment at 1986 Maryland Avenue. Appellant walked toward the truck where his cousin, who had moved the truck out of the parking spot, was sitting in the driver's seat.
 {¶ 7} Moments later, several gunshots were heard, and the three women ran outside and saw appellant, with a gun in his hand, running out of a "cut between" the buildings from the area where the shots were fired. Lewis told appellant, "you got to be F'd up; I'm calling the police." (Tr. 563.) Lewis called 911 and heard the truck speed off, squealing its tires in the process. Lewis found Armstrong at the door of his sister's apartment, where he eventually died on the porch.
 {¶ 8} According to Lakeisha Irvin ("Irvin"), Armstrong's sister, she heard several gunshots and, a few moments later, opened her door to find her brother. Peterson, who was on her own porch at the time, heard gunshots and saw appellant's truck speed off quickly. *Page 4 
 {¶ 9} The police arrived shortly thereafter. Columbus Police Officer Kevin Eckenrode was the first officer to respond to the call dispatched on September 15, 2005, at 1:03 a.m., of shots fired. Columbus Police Officer Kevin Yankovich was the second officer to arrive, and a female at the scene told him that he needed to "talk to Erika." (Tr. 265.) Less than a minute later, Lewis identified herself to Officer Yankovich and went to his cruiser for questioning. Lewis told Officer Yankovich of the house off Fifth Avenue where the marijuana was purchased, and they drove to that location so that Lewis could point out the exact house to the police. Lewis also told Officer Yankovich "Nut" was responsible for the shooting and that she did not know his real name.
 {¶ 10} After returning to the scene, Lewis talked to homicide detectives that had arrived. Thereafter, Lewis gathered a few belongings and went to stay at another apartment. The next day, Lewis and Reeves identified appellant out of a photo array. An arrest warrant was issued for appellant on September 16, 2005, and he was eventually apprehended in Georgia.
 {¶ 11} On December 14, 2005, appellant was indicted on one count of aggravated murder, pursuant to R.C. 2903.01, with a specification, pursuant to R.C. 2941.145, and one count of having a weapon under disability ("WUD"), pursuant to R.C. 2923.13. A jury trial commenced on July 17, 2006, but the jury was unable to reach a verdict on either charge. A second jury trial commenced on September 10, 2007, and appellant elected to waive his right to a jury on the WUD charge. The jury was again unable to reach a verdict as to the aggravated murder charge, and again a mistrial was declared. The trial court found appellant guilty of the WUD charge and sentenced appellant to a five-year term of *Page 5 
incarceration. Said conviction and sentence was affirmed by this court in State v. Whiteside, 10th Dist. No. 07AP-951, 2008-Ohio-3951.
 {¶ 12} The third jury trial commenced on May 5, 2008. After deliberations, the jury returned a not-guilty verdict on the aggravated murder and murder charges, but guilty of the lesser-included offense of voluntary manslaughter with specification. A sentencing hearing was held on June 9, 2008, and appellant was sentenced to 13 years on the manslaughter conviction to run concurrent with the sentence imposed for the WUD conviction. Appellant timely appealed and brings the following nine assignments of error for our review:
 ASSIGNMENT OF ERROR #1
 PRIOR TO THE THIRD TRIAL AND AFTER TWO HUNG JURY MISTRIALS, THE COURT ERRED WHEN IT DENIED APPELLANT'S MOTION TO DISMISS IN VIOLATION OF THE DOUBLE JEOPARDY AND DUE PROCESS CLAUSES OF FIFTH
AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND THE CORRESPONDING PROVISIONS OF THE OHIO CONSTITUTION, AND THE OHIO RULES OF CRIMINAL PROCEDURE.
 ASSIGNMENT OF ERROR #2
 APPELLANT'S CONVICTION FOR MANSLAUGHTER WAS NOT SUPPORTED BY THE SUFFICIENCY OF THE EVIDENCE IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 1 16 OF THE OHIO CONSTITUTION AND THE MANSLAUGHTER CONVICTION WAS ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 ASSIGNMENT OF ERROR #3
 THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S RULE 29 MOTION IN ALL THREE TRIALS. *Page 6 
 ASSIGNMENT OF ERROR #4
 APPELLANT'S MAXIMUM SENTENCE FOR MANSLAUGHTER VIOLATED THE PROVISION AGAINST EX POST FACTO LAWS AND HIS DUE PROCESS RIGHTS CONTAINED IN THE OHIO AND U.S. CONSTITUTIONS.
 ASSIGNMENT OF ERROR #5
 THE TIAL COURT ERRED WHEN IT PROHIBITED RONNIE BLAND FROM TESTIFYING AND ASSERTING HIS FIFTH AMENDMENT RIGHTS AGAINST SELF-INCRIMINATION BEFORE THE JURY, IN VIOLATION OF THE COMPULSORY PROCESS AND DUE PROCESS CLAUSES OF THE U.S. 
OHIO CONSTITUTIONS AND COLUMBUS V. COOPER.
 ASSIGNMENT OF ERROR #6
 THE TRIAL COURT ERRED WHEN IT PROHIBITED ERIKA LEWIS FROM TESTIFYING AND ASSERTING HER FIFTH AMENDMENT RIGHTS AGAINST SELF-INCRIMINATION BEFORE THE JURY, IN VIOLATION OF THE CONFRONTATION CLAUSE AND DUE PROCESS CLAUSES OF THE OHIO AND U.S. CONSTITUTIONS AND OHIO EVIDENCE RULE 608(B).
 ASSIGNMENT OF ERROR #7
 THE TRIAL COURT ERRED BY NOT ALLOWING THE INTRODUCTION OF RONALD BLAND'S INTERVIEW OR AT LEAST BY NOT PERMITTING TRIAL COUNSEL TO QUESTION THE POLICE ABOUT THE SUBSTANCE OF THEIR INTERVIEW WITH RONALD BLAND IN VIOLATION OF THE HEARSAY EXCEPTIONS CONTAINED IN THE OHIO RULES OF EVIDENCE AND THE FEDERAL AND OHIO CONSTITUTIONAL PROTECTIONS OF DUE PROCESS OF LAW, FUNDAMENTAL FAIRNESS, COMPULSORY PROCESS, CONFRONTATION, EQUAL PROTECTION, AND THE RIGHT TO PRESENT A COMPLETE DEFENSE.
 ASSIGNMENT OF ERROR #8 *Page 7 
 PROSECUTORIAL AND POLICE MISCONDUCT IN THE FORM OF THE WITNESS INTIMIDATION OF RONNIE BLAND, A DEFENSE WITNESS, VIOLATED THE APPELLANT'S RIGHT TO A FAIR TRIAL, COMPULSORY PROCESS, SUBSTANTIVE DUE PROCESS AND EQUAL PROTECTION UNDER THE FEDERAL AND OHIO CONSTITUTIONS.
 ASSIGNMENT OF ERROR #9
 TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 10
AND 16 OF THE OHIO CONSTITUTION.
 {¶ 13} On December 22, 2008, appellant filed a motion for leave to file a supplemental brief to assert an additional assignment of error. Said motion was granted by this court on December 30, 2008. Appellant's supplemental assigned error, designated as his tenth assignment of error, states:
 ASSIGNMENT OF ERROR #10
 PROSECUTORIAL MISCONDUCT CONSISTING OF IMPROPER AND PREJUDICIAL COMMENTS BY THE PROSECUTOR IN ITS REBUTTAL CLOSING STATEMENT VIOLATED THE APPELLANT'S RIGHT TO A FAIR TRIAL, DUE PROCESS AND EQUAL PROTECTION UNDER THE FEDERAL AND OHIO CONSTITUTIONS AND TRIAL COUNSEL FAILURE'S [sic] TO OBJECT CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 10
AND 16 OF THE OHIO CONSTITUTION.
 {¶ 14} In his first assigned error, appellant contends the trial court erred in denying his motion to dismiss the charges herein based on the Double Jeopardy and Due Process Clauses of the Fifth andFourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. According to appellant, the Double *Page 8 
Jeopardy Clause prohibits a second retrial in order to give the prosecution another opportunity to supply evidence that was not presented in the first proceeding, and cites Burks v. United States
(1978), 437 U.S. 1, 98 S.Ct. 2141, in support of the same. We find no merit to appellant's position.
 {¶ 15} It is well-established that the Double Jeopardy Clause protects against successive prosecutions for the same offense. State v.Lovejoy (1997), 79 Ohio St.3d 440, 443, citing United States v.Dixon (1993), 509 U.S. 688, 696, 113 S.Ct. 2849, 2856. However, the United States Supreme Court has consistently held that a retrial following a mistrial because of a deadlocked jury does not violate double jeopardy principles. State v. Crago (1994), 93 Ohio App.3d 621,633. In Richardson v. United States (1984), 468 U.S. 317,104 S.Ct. 3081, the court stated:
 [T]he protection of the Double Jeopardy Clause by its terms applies only if there has been some event, such as an acquittal, which terminates the original jeopardy. * * * Since jeopardy attached here when the jury was sworn, * * * petitioner's argument necessarily assumes that the judicial declaration of a mistrial was an event which terminated jeopardy in his case and which allowed him to assert a valid claim of double jeopardy.
 [W]e reaffirm the proposition that a trial court's declaration of a mistrial following a hung jury is not an event that terminates the original jeopardy to which petitioner was subjected. The Government, like the defendant, is entitled to resolution of the case by verdict from the jury, and jeopardy does not terminate when the jury is discharged because it is unable to agree. Regardless of the sufficiency of the evidence at petitioner's first trial, he has no valid double jeopardy claim to prevent his retrial.
(Citations and footnotes omitted.) Id. at 325-26. *Page 9 
 {¶ 16} In Richardson, the defendant was indicted on two counts of distributing a controlled substance and one count of conspiracy to distribute a controlled substance. The jury acquitted the defendant of one count but was unable to reach a verdict as to the two remaining counts. The trial court declared a mistrial as to the two remaining counts and scheduled a retrial. The trial court further denied the defendant's motion to dismiss on double jeopardy grounds.
 {¶ 17} On appeal to the United States Supreme Court, the defendant, relying on Burks, asserted that if the government failed to introduce sufficient evidence to establish guilt beyond a reasonable doubt at the first trial, then he could not be retried again following a declaration of a mistrial because of a hung jury. The Supreme Court rejected this argument. The court, in discussing the long line of cases holding that a retrial following a "hung jury" does not violate double jeopardy concerns, stated:
 We are entirely unwilling to uproot this settled line of cases by extending the reasoning of Burks, which arose out of an appellate finding of insufficiency of evidence to convict following a jury verdict of guilty, to a situation where the jury is unable to agree on a verdict. * * *
 * * *
 We think that the principles governing our decision in Burks, and the principles governing our decisions in the hung jury cases, are readily reconciled when we recognize that the protection of the Double Jeopardy Clause by its terms applies only if there has been some event, such as an acquittal, which terminates the original jeopardy.
(Citations omitted.) Richardson, 468 U.S. at 324-25.
 {¶ 18} In the present case, as in Richardson, jeopardy did not terminate when the jury was discharged because of its inability to agree. Consequently, appellant was not *Page 10 
subject to a successive prosecution at his retrial, and there are no double jeopardy implications here.
 {¶ 19} Appellant also contends under this assigned error that more than two trials violates the constitutional guarantees of due process and fundamental fairness. In United States v. Moore (C.A. 6, 1999), No. 96-2566, 1999 U.S. App. LEXIS 10917, 1999 WL 357760, the defendant was charged in a two-count indictment with intent to distribute cocaine base and with being a felon in possession of a firearm. The defendant was tried three times. The first and second trials resulted in mistrials from hung juries; however, the defendant was acquitted of the firearms charge after the second trial. Relying on Michigan case law, the defendant argued his retrial violated his due process rights. The court noted: "The Michigan Supreme Court reversed that decision finding no due process bar to subsequent retrials after mistrials. We agree that neither Michigan nor federal due process guarantees create a right to preclude defendant's retrial. Therefore, a third trial was proper." (Citations and footnotes omitted.) Id.
 {¶ 20} Thus, Moore makes clear there is no stated federal due process right to preclude a defendant's retrial following a hung jury. To the extent Ohio courts have entertained this issue, the Ninth District inState v. Roper, 9th Dist. No. 20836, 2002-Ohio-7321, discussed the Supreme Court of Hawaii's list of the following factors to be considered when reaching such a determination:
 "1) the severity of the offense charged; 2) the number of prior mistrials and the circumstances of the jury deliberation therein, so far as is known; 3) the character of prior trials in terms of length, complexity and similarity of evidence presented; 4) the likelihood of any substantial difference in a subsequent trial, if allowed; 5) the trial court's own evaluation of the relative case strength; and 6) the professional conduct *Page 11 
and diligence of respective counsel, particularly that of the prosecuting attorney."
Id. at ¶ 85, quoting State v. Moriwake (1982), 65 Hawaii 47, 55, 647
P.2d 705, 712. The Roper court also noted similar factors set forth by an Iowa Court of Appeals:
 "(1) weight of the evidence of guilt or innocence; (2) nature of the crime involved; (3) whether defendant is or has been incarcerated awaiting trial; (4) whether defendant has been sentenced in a related or similar case; (5) length of such incarceration; (6) possibility of harassment; (7) likelihood of new or additional evidence at trial; (8) effect on the protection to society in case the defendant should actually be guilty; (9) probability of greater incarceration upon conviction of another offense; (10) defendant's prior record; (11) the purpose and effect of further punishment; and (12) any prejudice resulting to defendant by the passage of time."
Id. at ¶ 86, quoting State v. Lundeen (Iowa App. 1980), 297 N.W.2d 232,236. Additionally, the Roper court noted that such decision rests within the sound discretion of the trial court. Id. at ¶ 77.
 {¶ 21} On appeal, appellant argues to this court that he was held in jail for over two years enduring the "stress and strain of multiple trials and long periods of uncertainty." (Appellant's brief, 12.) Though appellant was incarcerated while waiting for the retrials, it is undisputed appellant was sentenced to five years' incarceration on his WUD conviction that was affirmed by this court. Also, the charge herein is for a serious offense, aggravated murder, and there is no evidence, nor allegation, that the prosecution was motivated by bad faith or that the process has been unfair to appellant. Further, there is no evidence, nor allegation, that there is any reason to believe a jury could not be able to reach a unanimous verdict. As such, we find no due process violation in the retrial of appellant after two prior trials resulted in mistrials due to hung juries. *Page 12 
 {¶ 22} Based on the foregoing, appellant's first assignment of error is overruled.
 {¶ 23} In his second assignment of error, appellant challenges both the sufficiency and the weight of the evidence pertaining to his conviction.
 {¶ 24} The Supreme Court of Ohio described the role of an appellate court presented with a sufficiency-of-the-evidence argument in State v.Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus:
 An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (Jackson v. Virginia [1979], 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, followed[.])
 {¶ 25} Whether the evidence is legally sufficient is a question of law, not fact. State v. Thompkins (1997), 78 Ohio St.3d 380, 386. In determining the sufficiency of the evidence, an appellate court must give "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson v.Virginia (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789. Consequently, the weight of the evidence and the credibility of the witnesses are issues primarily determined by the trier of fact. State v.Yarbrough, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79; State v. Thomas
(1982), 70 Ohio St.2d 79, 80. Thus, a jury verdict will not be disturbed unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the *Page 13 
conclusion reached by the trier of fact. State v. Treesh (2001),90 Ohio St.3d 460, 484; Jenks, supra.
 {¶ 26} A manifest-weight argument is evaluated under a different standard. "The weight of the evidence concerns the inclination of the greater amount of credible evidence offered in a trial to support one side of the issue rather than the other." (Citation omitted.) State v.Brindley, 10th Dist. No. 01AP-926, 2002-Ohio-2425, ¶ 16. In order for a court of appeals to reverse the judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court must disagree with the fact finder's resolution of the conflicting testimony. Thompkins, at 387. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. Id., quoting State v.Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 27} A defendant is not entitled to a reversal on manifest-weight grounds merely because inconsistent evidence was presented at trial.State v. Raver, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21. The determination of weight and credibility of the evidence is for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230. The rationale is that the trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible. State v.Williams, 10th Dist. No. 02AP-35, 2002-Ohio-4503, ¶ 58; State v.Clarke (Sept. 25, 2001), 10th Dist. No. 01AP-194. The trier of fact is free to *Page 14 
believe or disbelieve all or any of the testimony. State v. Jackson
(Mar. 19, 2002), 10th Dist. No. 01AP-973; State v. Sheppard (Oct. 12, 2001), 1st District No. C-000553. Consequently, although an appellate court must act as a "thirteenth juror" when considering whether the manifest weight of the evidence requires reversal, it must give great deference to the fact finder's determination of the witnesses' credibility. State v. Covington, 10th Dist. No. 02AP-245, 2002-Ohio-7037, ¶ 22; State v. Hairston, 10th Dist. No. 01AP-1393, 2002-Ohio-4491, ¶ 17.
 {¶ 28} Appellant was convicted of voluntary manslaughter in violation of R.C.
2903.03(A), which provides in relevant part:
 No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another or the unlawful termination of another's pregnancy.
 {¶ 29} Appellant's argument focuses mainly on the weight of the evidence as his argument pertaining to the sufficiency of the evidence is that there is no eyewitness testimony, no physical evidence, and no evidence of a confrontation between Armstrong and appellant.
 {¶ 30} While this case does indeed turn on circumstantial evidence, the Supreme Court of Ohio has held that "[a] conviction can be sustained based on circumstantial evidence alone." State v. Franklin (1991),62 Ohio St.3d 118, 124, citing State v. Nicely (1988), 39 Ohio St.3d 147,154-55. In fact, circumstantial evidence may "`"be more certain, satisfying and persuasive than direct evidence."'" State v. Ballew
(1996), 76 Ohio St.3d 244, 249, quoting State v. Lott (1990),51 Ohio St.3d 160, 167, quoting *Page 15 Michalic v. Cleveland Tankers, Inc. (1960), 364 U.S. 325, 330,81 S.Ct. 6, 11. As will be explained, we find that there is sufficient evidence in the record to establish the shooter's identity in this case.
 {¶ 31} Lewis testified she and Armstrong had recently broken up and she had just met appellant, who she only knew as "Nut" on September 14, 2005. Lewis further testified that appellant and two men came to her apartment around midnight of September 14, 2005 to smoke marijuana. While she, appellant, Reeves, and Lovett were in her kitchen, the two other men were in her living room. Armstrong rode by on his bicycle, and an exchange occurred between Lewis and Armstrong. Though Lewis told appellant to disregard Armstrong's comments, appellant said something to the two men in the living room, and all three men left. The three men came back inside, then left again out the back door. Appellant and Armstrong talked, and the two men went towards the truck. Appellant and Armstrong then went in opposite directions — Armstrong towards his sister's apartment, and appellant towards the truck. A few moments later, Lewis heard five to six gunshots. She testified that, as she ran outside, appellant ran out of a pathway from where the shots were fired. Appellant ran past Lewis with a gun in his right hand at his side. As they passed, Lewis said to him, "You got to be F'd up; I'm calling the police." (Tr. 563.) Lewis called 911 and heard the truck squeal its tires as it sped off.
 {¶ 32} Reeves testified she lived at 1983 Maryland Avenue during the time of the shooting. She was at Lovett's apartment and the two went to Lewis's apartment that night. Appellant was in Lewis's kitchen and had a revolver on his lap which he later put away. The three women were in the kitchen with appellant, and the two other men were in the living room. Lewis was sitting on appellant's lap, and Armstrong rode by on a *Page 16 
bicycle a few times. Armstrong exchanged words with Lewis. Thereafter, appellant said something to the men in the living room and went outside. Appellant entered the apartment again, then left and was talking to Armstrong in the parking lot. According to Reeves, Armstrong was just standing there, and appellant was "holding the handle of the gun." (Tr. 776.) Armstrong then turned and walked away, and appellant walked the other direction. Moments later Reeves heard "like seven" gunshots, and she and Lewis ran out the front door. (Tr. 780.) Reeves stated she saw appellant running out of the "cut between" the buildings with a gun in his hand. Reeves testified as follows:
 I think it was in the right hand because when he — when he came out this cut right here and he seen me and Erica right here, he pointed it at us at about right here, and the truck was right like right along in here.
 And, Erica, Erica's distraught, get to screaming at him. And he like he dropped his arm back down, and he ran to the car.
 Erica took off this way through this cut. I ran back this away up this cut.
(Tr. 782.)
 {¶ 33} Reeves then heard the truck squeal its tires as it sped out of the parking lot. Reeves and Lewis ran towards Irvin's apartment and found Armstrong bleeding from his mouth.
 {¶ 34} Columbus Police Detective John A. Weeks testified Lewis told him in an interview at the scene that "Nut" was the responsible party. After getting a tip on the identity of Nut, Detective Weeks showed Lewis a photo array. Lewis identified appellant out of the photo array on September 16, 2005, as did Reeves approximately 30 minutes later. *Page 17 
 {¶ 35} Lovett testified she lived at 1982 Maryland Avenue at the time of the shooting. On the night of September 14, 2005, she and Reeves were together when Lewis came over to her apartment. As they walked into the kitchen, appellant was sitting in a chair with a gun, described as a revolver, on his lap that he later put in his back pocket. Two other men were in the living room. Armstrong rode by on a bicycle a few times, then stopped and said something and gave mean looks to Lewis. After Armstrong left, appellant got up, said something to his friends in the living room, and the three men went outside. The two men went to the truck while appellant went some other direction. Lovett heard "two, maybe three gunshots" and the three women ran out the front door though Lovett stopped at the doorway. (Tr. 689.) Lovett saw appellant run around the corner coming from where she heard the shots. Lovett stated: "He was running, and he had like I figured it was a gun because it was the shiny silver that I seen, and he pointed it at us." (Tr. 695.) According to Lovett, after he pointed the gun, appellant "got in the truck" and "speeded off." (Tr. 697-98.)
 {¶ 36} Irvin, Armstrong's sister, lived at 1986 Maryland Avenue. She was preparing for bed that night when she heard four to six gunshots. When Irvin opened her door, she saw Armstrong bleeding on the porch where he died. Irvin saw Lewis running towards Irvin's apartment screaming "my baby, my baby." (Tr. 415.)
 {¶ 37} Sharelle Stubbs ("Stubbs") was at Irvin's apartment that night and heard approximately four gunshots and then pounding on the door. Irvin opened the door and Stubbs saw Armstrong standing there. Stubbs testified she told the police to talk to Lewis. *Page 18 
 {¶ 38} Toshia Estridge ("Toshia") lived next door to Irvin and heard approximately seven gunshots. Toshia heard banging on the door and opened it to see Armstrong. Toshia saw no one leaving, but remembers Reeves and Lewis running up and that Lewis was on the phone saying "they shot my baby." (Tr. 462.)
 {¶ 39} Takia Estridge ("Takia"), Toshia's sister, testified she was at Toshia's when she heard approximately five to six gunshots. Takia did not see anything, but heard someone outside say, "they shot my baby." (Tr. 469.)
 {¶ 40} Peterson, who met appellant earlier that day, also lived at the Nelson Park apartments. Peterson was on her porch that night and saw Armstrong ride towards Lewis's apartment on a bicycle. About five minutes later, Peterson heard shots and ran towards Irvin's apartment. Peterson saw "the truck driving off real fast." (Tr. 491.) When she arrived at Irvin's apartment, Peterson saw Armstrong lying on the steps.
 {¶ 41} We find that based on the evidence and the testimony of all the witnesses, viewed in a light most favorable to the prosecution, as is required, a reasonable trier of fact could have found beyond a reasonable doubt that appellant was indeed guilty of voluntary manslaughter. Therefore, we cannot conclude there is insufficient evidence to sustain appellant's conviction.
 {¶ 42} Similarly, we cannot say that the jury's verdict is against the manifest weight of the evidence. The basis for appellant's manifest-weight challenge is the witnesses' conflicting testimony and inconsistencies with respect to some of the details surrounding the events that evening. Essentially, appellant challenges the witnesses' credibility.
 {¶ 43} All of what appellant argues, however, was presented to, and rejected by, the jury. Additionally, while there were some discrepancies in the testimony, much of the *Page 19 
testimony was consistent in significant areas. Lewis, Lovett and Reeves all testified appellant was at Lewis's apartment when Armstrong rode by several times on his bicycle. All three women testified appellant had a gun and described it as a revolver. The testimony regarding Armstrong riding a bicycle past Lewis's apartment and then stopping and making comments to Lewis was also consistent. Similarly, all three women testified that after Armstrong left, appellant said something to the two men in the living room, those two men eventually left and went to the truck, and appellant went out and talked with Armstrong. After the two men went their separate ways, all three women heard gunshots and ran outside and saw appellant, with a gun in his hand, running from the area from which the shots were fired. Appellant then ran to the truck, and it sped off squealing its tires in the process.
 {¶ 44} Peterson testified she heard the shots and ran to the area and saw appellant's truck speeding off out of the parking lot. Lewis told police that night that "Nut" was responsible for the shooting and picked him out of a photo array the following day. Lovett, Reeves and Peterson identified appellant from a photo array as well.
 {¶ 45} Appellant takes issue with the fact that Lewis changed clothes just after the shooting and prior to speaking with the police. Lewis explained, however, that she ran out the door wearing shorts and no shoes and, since she knew she would be speaking with police, went home to put on jeans and tennis shoes before returning to the scene. Also, Officer Yankovich, who was the second officer to arrive at the scene, testified that as he was inquiring as to what happened, someone told him he needed to talk to "Erika," who within a minute came up to him and identified herself. *Page 20 
 {¶ 46} As previously stated, the weight to be given to the evidence and the credibility of the witnesses are issues primarily for the trier of fact. DeHass, supra. While this case does indeed turn on circumstantial evidence, as we indicated previously, the Supreme Court of Ohio has held that "[a] conviction can be sustained based on circumstantial evidence alone." Franklin, supra, at 124. In fact, circumstantial evidence may "`be more certain, satisfying and persuasive than direct evidence.'" Ballew, at 249, quoting Lott, at 167. Furthermore, a conviction is not against the manifest weight of the evidence simply because the trier of fact chose to believe the prosecution's witnesses and chose not to believe appellant. State v.Rippey, 10th Dist. No. 04AP-960, 2005-Ohio-2639.
 {¶ 47} After carefully reviewing the trial court's record in its entirety, we conclude that there is nothing to indicate that the jury clearly lost its way or that any miscarriage of justice resulted. Consequently, we cannot say that appellant's conviction is against the manifest weight of the evidence.
 {¶ 48} Accordingly, appellant's second assignment of error is overruled.
 {¶ 49} In his third assignment of error, appellant contends the trial court erred when it denied his Crim. R. 29 motion in all three trials. To the extent appellant states it was error for the trial court to deny his Crim. R. 29 motion in the first two trials, we note "appellant was subsequently retried on the same charge, therefore, we find these assigned errors moot and not well taken." State v. Dudte (Nov. 1, 1991), 5th Dist. No. CA-979; State v. Swartz (Nov. 29, 1985), 6th Dist. No. E-85-26 (errors relating to a trial which resulted in a hung jury are rendered moot where the defendant was retried on the same charge). Therefore, we confine ourselves to the third trial. *Page 21 
 {¶ 50} Crim. R. 29(A) states in pertinent part:
 The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses. The court may not reserve ruling on a motion for judgment of acquittal made at the close of the state's case.
 {¶ 51} A motion for judgment of acquittal, pursuant to Crim. R. 29, tests the sufficiency of the evidence. State v. Darrington, 10th Dist. No. 06AP-160, 2006-Ohio-5042, ¶ 15, citing State v. Knipp, 4th Dist. No. 06CA641, 2006-Ohio-4704, ¶ 11. Accordingly, an appellate court reviews a trial court's denial of a Crim. R. 29 motion for acquittal using the same standard for reviewing a sufficiency-of-the-evidence claim.Darrington, ¶ 15, citing State v. Barron, 5th Dist. No. 05 CA 4,2005-Ohio-6108, ¶ 38.
 {¶ 52} For the reasons stated in our disposition of appellant's second assignment of error, appellant's third assignment of error is overruled.
 {¶ 53} In his fourth assignment of error, appellant contends the trial court erred when it sentenced him to a maximum sentence on the voluntary manslaughter charge in violation of his ex post facto and due process rights. According to appellant, because he was sentenced after the Supreme Court of Ohio rendered its decision in State v. Foster,109 Ohio St.3d 1, 2006-Ohio-858, he was disadvantaged because the trial court no longer had to make specific factual findings and put its reasons on the record for imposing a maximum sentence.
 {¶ 54} As recently stated by this court in State v.Morales-Gomez, 10th Dist. No. 08AP-336, 2008-Ohio-6513: *Page 22 
 In Foster * * * "the Ohio Supreme Court held that under the United States Supreme Court's decisions in Apprendi v. New Jersey (2000), 530 U.S. 466, 120 S.Ct. 2348, and Blakely v. Washington (2004), 542 U.S. 296, 124 S.Ct. 2531, portions of Ohio's sentencing scheme were unconstitutional because they required judicial fact finding before a defendant could be sentenced to more than the minimum sentence, the maximum sentence, and/or consecutive sentences." State v. Houston, Franklin App. No. 06AP-662, 2007-Ohio-423, at ¶ 30, appeal not allowed, 114 Ohio St.3d 1426, 2007-Ohio-2904. To remedy the situation, "the Ohio Supreme Court severed the offending sections from Ohio's sentencing code. Thus, pursuant to Foster, trial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive or more than minimum sentences." Id. at ¶ 3, citing Foster, supra, at ¶ 100.
 In Houston, supra, this court addressed and rejected the constitutional arguments defendant raises on appeal. "Specifically, in Houston, we concluded that the Foster severance remedy does not violate a defendant's due process rights and right against ex post facto laws" because defendant "had notice `of the potential sentences at the time they committed their crimes, and because the remedial holding of Foster was not unexpected[.]'" State v. Lariva, Franklin App. No. 06AP-758, 2007-Ohio-1012, at ¶ 11, quoting Houston, supra, at ¶ 4.
 Finally, defendant contends Foster is unconstitutional. Houston, however, not only noted this court simply implements Foster, but observed that "it is unlikely the Ohio Supreme Court would direct inferior courts to violate the constitution, and, in any event, inferior courts are bound by Ohio Supreme Court directives." Houston, at ¶ 4.
 Accordingly, the trial court did not violate defendant's due process rights or his protections against ex post facto laws in sentencing him to a maximum term of incarceration.
Id. at ¶ 4-7.
 {¶ 55} As demonstrated, this court has repeatedly rejected due process and ex post facto arguments against the Foster court's severance remedy. See also State v. *Page 23 Ragland, 10th Dist. No. 04AP-829, 2007-Ohio-836, ¶ 9; State v.Pruitt, 10th Dist. No. 06AP-1184, 2007-Ohio-2331, ¶ 5; State v.Horton, 10th Dist. No. 06AP-311, 2007-Ohio-4309, ¶ 68. Accordingly, we find no merit to appellant's fourth assignment of error and overrule the same.
 {¶ 56} In his fifth assignment of error, appellant contends the trial court erred when it prohibited Ronnie Bland ("Bland") from testifying and asserting his Fifth Amendment rights before the jury. According to appellant, this prohibition violated the Due Process and Compulsory Clauses of the United States and Ohio Constitutions, as well as the Supreme Court of Ohio's holding in Columbus v. Cooper (1990),49 Ohio St.3d 42.
 {¶ 57} Appellant asserts Bland approached authorities with information regarding another suspect in this matter, and that "[t]he jury should have been permitted to see and hear Bland answer whether someone else shot Jaron Armstrong and what, if any, role appellant played in the matter." (Appellant's brief, 26.) However, Bland had court-appointed counsel who indicated to the court that if called to testify, Bland would assert his Fifth Amendment rights. Therefore, the trial court conducted a voir dire of Bland outside the presence of the jury. During said voir dire, Bland testified he intended to assert hisFifth Amendment rights and would not testify or answer any of defense counsel's questions.
 {¶ 58} Despite appellant's reliance on Cooper, there is no "right" of defendant to call a witness solely for the purpose of invoking his or her Fifth Amendment rights in front of the jury. State v. Reed, 10th Dist. No. 08AP-20, 2008-Ohio-6082, ¶ 54. Though in Cooper, the Supreme Court of Ohio concluded a trial court could not exclude a person who has previously asserted his Fifth Amendment privilege against self-incrimination from *Page 24 
appearing as a witness on behalf of a criminal defendant, in State v.Kirk (1995), 72 Ohio St.3d 564, the Supreme Court of Ohio stated the holding in Cooper should be limited to its facts. In Kirk, after the prosecution addressed the possibility of calling Hoover as a witness, the court addressed Hoover's attorney, who said he advised Hoover not to testify. Thereafter, the court addressed Hoover, who said, if called, he would assert his Fifth Amendment privilege. Defendant's counsel argued he wanted to call Hoover regardless, and the trial court held that no party should call a witness to demonstrate that he would exercise hisFifth Amendment rights. The Kirk court limited and distinguishedCooper and held that a trial court may exclude a person from appearing as a witness on behalf of a criminal defendant at trial if the court determines that the witness will not offer any testimony, but merely intends to assert the Fifth Amendment privilege against self-incrimination. Id. at syllabus, paragraph one.
 {¶ 59} Despite Kirks holding, appellant relies on State v. Reiner
(2001), 93 Ohio St.3d 601 ("Reiner II"). In Reiner, a two-month-old child died as a result of shaken-baby syndrome, and the father was indicted on involuntarily manslaughter charges. Though the defense theory was that the babysitter was the perpetrator, the jury found the father guilty. Both parties subpoenaed the babysitter to testify at trial, and the trial court granted the babysitter transactional immunity. The Supreme Court of Ohio held the grant of immunity to the babysitter was erroneous because the babysitter had no Fifth Amendment privilege because she denied being the perpetrator. The United States Supreme Court reversed, concluding that the babysitter did have a validFifth Amendment privilege even though she denied any involvement in the case; however, the Supreme Court did not address whether immunity under R.C. 2945.44 was appropriate. On *Page 25 
remand, in a plurality opinion, the Supreme Court concluded the grant of immunity did not further the administration of justice. The plurality opinion stated:
 [T]his was an either/or situation. Either Reiner was guilty or Susan Batt was guilty. The government chose to indict Reiner and claimed that there was insufficient evidence to indict Batt. Batt continually claimed her innocence. However, immunity is not appropriate in the either/or situation; it could actually hinder the search for truth. The jury should have been permitted to hear Batt take the Fifth Amendment and to evaluate her testimony on that basis. The defense would have been able to present its theory of the babysitter's culpability without the court's giving the jury the impression that Batt was immune from prosecution because she did not commit the crime. Therefore, it did not further the administration of justice when the trial court agreed to grant her immunity from future prosecution. Instead, it severely prejudiced the rights of the defendant.
Id. at 605.
 {¶ 60} As mentioned, Reiner II is a plurality opinion, written by Justice Stratton, with two justices concurring, one justice concurring in judgment only, and three justices dissenting. Though it may be persuasive, a plurality opinion is not controlling because it fails to receive the support of the majority of the court. Hedrick v. MotoristsMut. Ins. Co. (1986), 22 Ohio St.3d 42, 44, overruled on other grounds. Also, the Reiner II court did not address Kirk and made no mention of the same. Lastly, we note our research has revealed no case that has cited Reiner II for the proposition set forth by appellant. In contrast,Kirk continues to be cited, as recently as the writing of this opinion, by appellate districts from around Ohio, for Kirks holding that a trial court may exclude a person from appearing as a witness on behalf of a criminal defendant at trial if the court determines that the witness will not offer any testimony, but merely intends to assert theFifth Amendment privilege against self-incrimination. *Page 26 
 {¶ 61} Based on the foregoing, the trial court did not err when it denied appellant's request that Bland take the stand to assert hisFifth Amendment privilege in the presence of the jury. Reed, supra. See alsoState v. Adams, 9th Dist. No. 07-CA-0086, 2008-Ohio-4939 (relying solely on Kirk and finding no error in the trial court's denial of the defendant's request to call a witness who in voir dire outside the jury's presence testified he would assert his Fifth Amendment right not to testify). Accordingly, appellant's fifth assignment of error is overruled.
 {¶ 62} In his sixth assignment of error, appellant contends the trial court erred when it prohibited Lewis from testifying and asserting herFifth Amendment rights in the jury's presence in violation of the Confrontation and Due Process Clauses of the United States and Ohio Constitutions.
 {¶ 63} Specifically, pursuant to Evid. R. 608(B), appellant expressed a desire to question Lewis about an instance of forgery and identity theft to which Lewis admitted so as to gain entrance in the Franklin County Prosecutor's Office Diversion Program. The trial court appointed counsel for Lewis, who indicated that, if asked, Lewis would assert herFifth Amendment rights. The trial court conducted a voir dire of Lewis outside the jury's presence, and Lewis indeed asserted her Fifth Amendment rights.
 {¶ 64} For the reasons stated in our disposition of appellant's fifth assignment of error, we find no merit to appellant's argument and overrule appellant's sixth assignment of error.
 {¶ 65} In his seventh assignment of error, appellant contends the trial court erred in not allowing him to introduce Bland's interview with the police and/or by not permitting appellant to question the police as to the substance of the interview. Appellant makes *Page 27 
reference to filing a memorandum in the second trial to introduce this evidence; however, we note again that the second trial resulted in a mistrial and appellant was retried on the same charge. Therefore, error relating to the first and second trials are moot, and we confine ourselves to the third trial. Dudte, supra; Swartz, supra.
 {¶ 66} In the third trial, however, appellant did not seek to introduce Bland's police interview; therefore, to this extent, appellant's argument is meritless. Appellant was, however, permitted to cross-examine Detective Weeks regarding this issue. Detective Weeks was asked about receiving information from Bland concerning other potential suspects. Detective Weeks stated that Bland "described to us in that interview that that particular individual was now deceased, having been a victim of a homicide." (Tr. 944.)
 {¶ 67} Apparently, Bland went to the police and gave them the name of a person named Calvin. Bland did not know Calvin's last name, but thought it could have been Edwards. Detective Weeks explained on cross-examination that based on the information given by Bland, the police data base and files were searched, but he was unable to find a report under the name given by Bland. Detective Weeks testified he also searched the apartment complex to find a person with that name, but was unsuccessful. Defense counsel was then permitted, over objection, to introduce an article and obituary naming a Calvin Parker that was reportedly shot and killed at 2032 Maryland Avenue.
 {¶ 68} Thus, though appellant did not seek to introduce the interview in the third trial, appellant was permitted to cross-examine the detective about the interview itself. Therefore, appellant's seventh assignment of error is overruled.
 {¶ 69} In his eighth assignment of error, appellant contends prosecutorial and police misconduct in the form of witness intimidation of Bland violated appellant's *Page 28 
constitutional rights. According to appellant, Detective Weeks admitted the police "invoked an ugly and discriminatory racial reference toward Bland" to force Bland to change his story. (Appellant's brief, 30.)
 {¶ 70} First, we note Bland did not testify because he, upon the advice of counsel, invoked his Fifth Amendment rights during his voir dire conducted outside the jury's presence. Second, the issue regarding the detective's comments to Bland were raised in Detective Week's cross-examination as follows:
 Q. And do you believe that you attempted to intimidate him during the interview?
 A. No, sir.
 Q. Because he wasn't providing you information that corroborated your theory, were you attempting to intimidate him?
 A. No.
 Q. It was you and Detective Fulton in that interview, correct?
 A. Along with Mr. Bland, yes.
 Q. Mr. Bland is an African American, isn't he?
 A. Yes, sir.
 Q. Detective, you don't think it's intimidating to tell an African American male that he's putting a noose around his neck?
 A. A figure of —
 Q. Do you believe that's intimidating? *Page 29 
 A. It's a figure of speech, sir. I don't know what would intimidate one person to the next.
 Q. You don't disagree that was said to Mr. Bland during that interview, do you?
 A. I believe that was said by Detective Fulton during the interview, yes, sir.
(Tr. 946-47.)
 {¶ 71} Appellant states this witness intimidation coupled with repeated attempts to try him for murder were violative of his constitutional rights. However, we do not find we are presented with evidence of witness intimidation as it clear from the record Bland's counsel advised Bland to assert his Fifth Amendment rights if asked questions pertaining to the same. Moreover, the defense theory that someone else was the perpetrator and that the police ignored other potential suspects was set forth for the jury's consideration as it was explored during the cross-examination of Detective Weeks. Accordingly, appellant's eighth assignment of error is overruled.
 {¶ 72} In his ninth assignment of error, appellant contends he received ineffective assistance of counsel. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."Strickland v. Washington (1984), 466 U.S. 668, 686, 104 S.Ct. 2052,2064. In order to establish a claim of ineffective assistance of counsel, a defendant must first demonstrate that his trial counsel's performance was so deficient that it was unreasonable under prevailing professional norms. Id. at 687. The defendant must then establish "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would *Page 30 
have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.
 {¶ 73} According to Strickland:
 A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
Id. at 687.
 {¶ 74} "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Id. at 689, quotingMichel v. Louisiana (1955), 350 U.S. 91, 100-01, 76 S.Ct. 158, 163-64. A verdict adverse to a criminal defendant is not of itself indicative that he received ineffective assistance of trial counsel. State v.Hester (1976), 45 Ohio St.2d 71, 75. *Page 31 
 {¶ 75} Specifically, appellant contends his counsel was ineffective in failing to preserve the issues raised in his seventh and eighth assignments of error. We find that even if his counsel's actions with respect to the Bland interview could be construed as error, which we genuinely question, appellant cannot establish prejudice because the substance of the interview was brought out before the jury as was appellant's contention of witness intimidation by the police. Moreover, even if the entire interview was allowed into evidence, the jury still had before it the testimony of three witnesses that saw appellant, with a gun in his hand, running from the area where shots were fired and then speeding from the scene in a truck. Therefore, we are unable to find a reasonable probability that the result of the proceedings would have been different if counsel had been successful in convincing the trial court to admit the entire interview. Consequently, appellant's ninth assignment of error is overruled.
 {¶ 76} In his tenth assignment of error, appellant contends that in the closing rebuttal argument the prosecutor improperly referenced the manslaughter charge. The test for prosecutorial misconduct during closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights.State v. Were, 118 Ohio St.3d 448, 2008-Ohio-2762, ¶ 198, citingState v. Smith (1984), 14 Ohio St.3d 13, 14. Further, prosecutorial misconduct does not warrant a new trial where the trial court properly instructs the jury and the verdict is clearly justified by the evidence.State v. Brandy, 10th Dist. No. 02AP-832, 2003-Ohio-1836, ¶ 20, citingState v. Maurer (1984), 15 Ohio St.3d 239, citing Golamb v. Layton
(1950), 154 Ohio St. 305, paragraph three of the syllabus. Moreover, "[p]rosecutors are entitled to latitude as to *Page 32 
what the evidence has shown and what inferences can reasonably be drawn from the evidence." Were, at ¶ 205, quoting State v. Smith (1997),80 Ohio St.3d 89, 111.
 {¶ 77} Specifically, appellant takes issue with the following two statements made during appellee's closing rebuttal:
 So he's asking you folks to think his client didn't do it, but if he did do it, he did it because he was so mad at the victim.
 * * *
 [Defense counsel] has you believe that it's inferior police work, a bunch of bad witnesses, and that all adds up to him being not guilty of aggravated murder but maybe he's guilty of involuntary [sic] manslaughter.
(Tr. 1186, 1193.)
 {¶ 78} According to appellant, the prosecutor misrepresented defense counsel's argument and said defense counsel wanted the jury to find his client guilty of the lesser-included offense of manslaughter.
 {¶ 79} At the onset, we note that appellant failed to object to these remarks and thus waived all but plain error. State v. Slagle (1992),65 Ohio St.3d 597. To constitute plain error, the error must be obvious on the record, palpable, and fundamental such that it should have been apparent to the trial court without objection. See State v. Tichon
(1995), 102 Ohio App.3d 758, 767. Moreover, plain error does not exist unless the appellant establishes that the outcome of the trial clearly would have been different but for the trial court's allegedly improper actions. State v. Waddell (1996), 75 Ohio St.3d 163, 166. Notice of plain error is to be taken with utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.State v. Phillips *Page 33 
(1995), 74 Ohio St.3d 72, 83; State v. Ospina (1992),81 Ohio App.3d 644, 647. We find neither plain nor prejudicial error.
 {¶ 80} We find nothing in the prosecutor's rebuttal comments indicates defense counsel wanted the jury to find appellant guilty of voluntary manslaughter. Rather, the prosecutor's rebuttal comments responded to earlier defense arguments in which appellant asked the jury to consider voluntary manslaughter, which takes into account serious provocation by the victim, if the jury found that appellant shot Armstrong. Specifically, defense counsel stated:
 It's our position, ladies and gentlemen, that the State did not prove beyond a reasonable doubt that Julius Whiteside shot Jaron Armstrong.
 If, however, you disagree with us, consider all of the lesser offenses, including the lesser offense of voluntary manslaughter, which takes into account serious provocation occasioned by the victim, in this case, Jaron Armstrong. Take into account the threats to shoot up the place. Take into account the gun.
(Tr. 1168-69.)
 {¶ 81} As demonstrated, the prosecutor was responding to defense argument, and we find nothing improper in the prosecutor's comments.
 {¶ 82} Moreover, isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning. Brandy, at ¶ 26, citing Donnelly v. DeChristoforo (1974), 416 U.S. 637, 647,94 S.Ct. 1868, 1873. A closing argument must be viewed in its entirety to determine prejudice. Id., citing State v. Byrd (1987), 32 Ohio St.3d 79,82. Viewed in its entirety, the prosecutor's closing argument neither materially prejudiced appellant nor denied him a fair trial. *Page 34 
 {¶ 83} Also under this assigned error, appellant contends his trial counsel was ineffective for failing to object to the challenged comments during the prosecutor's rebuttal. Because we have already determined appellant is unable to establish prejudice arising from the comments, we are unable to find a reasonable probability that the result of the proceedings would have been different if counsel had objected to the challenged comments. See Strickland, supra. Accordingly, appellant's tenth assignment of error is overruled.
 {¶ 84} For the foregoing reasons, appellant's ten assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
BROWN and TYACK, JJ., concur. *Page 1