[Cite as *State v. Battle*, 2019-Ohio-2931.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 18AP-728 |
| v. | : | (C.P.C. No. 17CR-2224) |
| James D. Battle, Jr., | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on July 18, 2019

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Seth L. Gilbert*, for appellee. **Argued:** *Seth L. Gilbert.*

**On brief:** *Yeura R. Venters,* Public Defender, and *Ian J. Jones,* for appellant. **Argued:** *Ian J. Jones.*

APPEAL from the Franklin County Court of Common Pleas

NELSON, J.

{¶ 1} After a shoot-up that apparently left two people with relatively minor gunshot wounds and a residence festooned with bullet holes, a jury convicted James D. Battle, Jr., of two counts of felonious assault, one count of discharging a firearm into a habitation, and one count of improperly handling a firearm in a motor vehicle, along with three firearm specifications. The trial judge sentenced him to a total of eight years in prison.

{¶ 2} Mr. Battle appeals, arguing that he was deprived of a fair trial because of comments made in the presence of the jury about absent witnesses and witness fear of retaliation, and because of testimony about driving without a license and a warrant unrelated to the charges for which he was tried, and about the earlier theft of the gun that he admitted using on the evening in question. He also challenges the legal sufficiency and manifest weight of the evidence regarding the convictions for felonious assault and

shooting into a dwelling; he does not extend his weight and sufficiency arguments to the improper handling conviction, as to which count his trial counsel had conceded guilt during closing argument, *see* Tr. at 629, 640.

{¶ 3}   By his own account to police, Mr. Battle was present at the events, in the company of armed companions, and had brought his own gun, fired his gun (leaving shell casings at the crime scene), and wound up behind the wheel of the get-away car (a car he had provided and in which his gun was discovered).   Upon review under the governing standards, we are not persuaded by any of his arguments on appeal:   We affirm Mr. Battle's convictions.   Explaining why, we begin with a brief summary of some of the evidence the jury heard.

{¶ 4}   Ciera Hampton testified that she lived with Kenya Chandler and their four children in a large apartment complex.   Tr. at 422-25.   Neighbors and friends had gathered to enjoy the temperate evening of April 12, 2017; everyone was "having fun and socializing," barbeque was on the grills, and "the kids were playing." Tr. at 426-27, 241.

{¶ 5}   A new group of five or six men then approached the gathering.   *Id.* at 428.   Ms. Hampton recognized one of the men in this new group as a neighbor named "Redd," who "seemed like he was calling out anybody who wanted to fight." Tr. at 428-29.   After she believed the men had started to leave without further incident, she walked into her home and was coming back out when she "started hearing gunfire." Tr. at 431.   People streamed toward her home because "[i]t was the closest door to go to." *Id.*

{¶ 6}   Reese Smith and Kenya Chandler were both injured by the gunfire. Tr. at 432-33. Several bullets struck Ms. Hampton's dwelling, with one lodging by the door and another going through an upstairs window.   Tr. at 434.   Ms. Hampton could not say how many shots or individual weapons were fired. Tr. at 435.

{¶ 7}   Kenya Chandler also testified.   According to Mr. Chandler, Redd had brought "a group of people to the neighborhood" to confront a teenager named "Duck." Tr. at 454-55. Redd asked Mr. Chandler where "the guy [Redd] want[ed] to fight" was before starting to walk away. Tr. at 457. When Redd and his group reached a nearby dumpster, Mr. Chandler heard "a whole bunch of shots" and saw everyone run into the apartment that he shared with Ms. Hampton. Tr. at 457-58. Mr. Chandler heard "three quick gunshots and then, like, thirty gunshots"; debris rained down from the bricks of the building, and bullet

holes appeared "all around the front door" and elsewhere. Tr. at 459, 462. He sustained injuries from the gunfire, including "a flesh wound on [his] left arm" and a wound on his "upper right chest." Tr. at 461.

{¶ 8} Sabrina Slappy was also present the evening of April 12, 2017, and told the jury she had been struck in the face by a flying fragment of brick. Tr. at 237, 247. She testified that Redd and his companions had engaged in a "big confrontation" and displayed "a violent attitude" before shots were fired. Tr. at 238-40. She was one of the people who fled inside the Hampton/Chandler apartment when the gunfire began. Tr. at 243. Ms. Slappy stated that her daughter, Jasmine, identified Redd to the police as one of the group of shooters. Tr. at 250. Ms. Slappy did not want her daughter involved lest she become "a target of retaliation," and only testified herself because she was subpoenaed by the court. Tr. at 251-52.

{¶ 9} Eddie Gray also lived in the apartment complex. Tr. at 220. Her door was open and she was in the doorway at the time the gunfire started. Tr. at 223. Ms. Gray ran out and got her seven-year-old grandson to bring him inside, at which point she saw "one male run past" wearing a red sweatshirt with a hood over his head and a gun in his hand. Tr. at 225-26, 232.

{¶ 10} Officer Jeffrey Gearhart and his partner responded to the shooting. Tr. at 266-67. As they arrived, Officer Gearhart "saw a vehicle leaving * * * at a high rate of speed" with multiple people inside. Tr. at 267. He identified the vehicle as a Chevy Malibu and had its license plate number broadcast over the police radio. Tr. at 269.

{¶ 11} Officer William Beard also responded to the dispatch. Knowing that other officers had arrived on the scene already, he drove south of the apartment complex to look for the vehicle that had been described. Tr. at 284-85. A mile past the complex, he pulled up behind a Chevy Malibu with matching plates. Tr. at 286-87. Mr. Battle, the driver, was at that point the only person in the vehicle. Tr. at 289, 291. After discovering that Mr. Battle had an outstanding warrant and a suspended license, Officer Beard arrested him. Tr. at 291, 294. At the time of his arrest, Mr. Battle was wearing a red sweatshirt. State's Ex. 63.

{¶ 12} Officer Benjamin Leppla performed an inventory of the vehicle, which included a live round of ammunition in a cup holder, Tr. at 306-07, a Smith & Wesson .45

in the back seat area, Tr. at 313-14, and several documents with Mr. Battle's name on them, Tr. at 310. The firearm contained a single live round in the chamber and three in the magazine. Tr. at 316.

{¶ 13} The jury also saw a recording of the interview police conducted with Mr. Battle (in a red garment) after his arrest. Tr. at 522; State's Ex. 71. During that questioning, Mr. Battle stated that he had gone with Redd and others to the complex, in the car that Mr. Battle provided, to give back-up protection to Redd as Redd squared off with an adversary in a contemplated fight. *See* State's Ex. 71 (video), *e.g.* at 16:20 ("wanted to make sure he didn't get jumped"); 32:00 – 34:00 (Redd had "got into it with some Dudes"; "We just out here to make sure you [that is, Redd] good"); 15:50 (Redd's desire to "confront the people"). He acknowledged that four of the five companions (all but Redd) were armed. *Id.* at 38:00-39:00.

{¶ 14} In the late stages of the interview, Mr. Battle repeatedly admitted to having fired his weapon, *see, e.g., id.* at 34:40 (Q: "Did you shoot the gun?" A: "Yeah"); 35:44 (not sure how many times he fired), without his earlier qualifiers, *see id.* at 23:10, 23:20, that he had not shot or had fired into the air. *See, e.g., id.* at 37:43 ("After [the man nicknamed] 40 shot, I shot"); 39:30 (after being advised that two people had been shot, and when asked, "Do you know where your bullets went?" he responded "Did I shoot anybody?"); 40:30 ("If I shot somebody, I'm sorry"); 46:39 ("I did shoot; I'm sorry").

{¶ 15} Mr. Battle further stated that he had been in the back seat of the Malibu when the group left the general area after the shooting, but that when Redd and the others had left the car a short distance away and fled on foot, he got into the front seat and "drove off" before the police pulled him over. *Id.* at 19:00. He admitted that the gun in the car was his. He stated that he had had it for more than two years, having acquired it from someone named Rick who owed him money. *Id.* at 20:15.

{¶ 16} Michael Wood testified to identify the gun in question as a service weapon that he had inherited from his father, a former Columbus Police Department lieutenant. Tr. at 495-98. Wood said that the gun had been stolen from his home in December of 2016 (less than five months before it was found in the car with Mr. Battle shortly after the shoot-up). Tr. at 497-98. Before the burglary, Wood had kept the weapon loaded with .45 caliber

ammunition. Tr. at 499. Wood identified shell casings from the scene of the shooting as the same brand and caliber in the gun at the time of the burglary. Tr. at 502.

{¶ 17} A ballistics expert testified that the three .45 caliber shell casings recovered from the scene of the shooting had been fired from the same gun, and tests of one of the spent cartridge cases matched it to the gun that Mr. Battle admitted to be his and that had been recovered from the car he had been driving. Tr. at 481-83; State's Ex. 49. Many other cartridges recovered from the scene had been fired from different, .40 caliber weapons. Tr. at 484-85.

{¶ 18} In his closing argument, Mr. Battle's lawyer conceded that Mr. Battle had been at the scene ("[h]e was there"), with the .45 ("it's crystal clear James Battle had a .45 caliber gun"), and that he had fired the gun ("[b]ottom line, [Mr. Battle] fired three or four shots"). Tr. at 628, 632. Mr. Battle's account that he had fired "up in the air" was "honest," his lawyer urged. Tr. at 618. Having "made a poor decision and judgment about helping out his [one cousin, '40'] for his other cousin, Redd" in going out that night, the defense lawyer argued among other points, Tr. at 634, he "was used by his two cousins for his girlfriend's car" (the Malibu in which he was arrested after the event), Tr. at 620. In sum, Mr. Battle's lawyer submitted, although "he does admit his guilt to you regarding that loaded firearm inside the car," Tr. at 629, he was "not the principal offender [,] * * * * not the ring leader[,] * * * * [and] did not aid or assist anybody[,] * * * * [but simply] was used for his girlfriend's car." Tr. at 637.

{¶ 19} The jury did not fully agree. It found Mr. Battle guilty beyond a reasonable doubt of two counts of felonious assault (involving Mr. Chandler, who the evidence showed was hit, and Ms. Hampton, who the evidence showed was amidst the shoot-up and whose dwelling was riddled by bullets), one count of improperly handling a firearm in a motor vehicle, and one count of discharging a firearm into a habitation, and of three gun specifications. Aug. 28, 2018 Resentencing Judgment Entry. It acquitted him of three other counts of felonious assault (two of which, as defense counsel emphasized, Tr. at 631, had specified as victims people who failed to appear at trial). Apr. 23, 2018 Verdict.

{¶ 20} To us, Mr. Battle contends in his first assignment of error that several statements made (but not objected to) during the trial denied him of his fair trial rights in violation of the Fourteenth Amendment to the United States Constitution and Article I,

Section 10 of the Ohio Constitution. (He does not appear to differentiate between the rights accorded under each provision, citing federal case law only for the point that the Fourteenth Amendment does secure the right to a fair trial.) We consider each of the specified statements in turn, and conclude that separately or in combination they did not violate Mr. Battle's constitutional rights under either constitutional provision.

{¶ 21} First, Mr. Battle argues that the trial court committed plain error when it allowed Ms. Slappy to testify that she did not want her daughter "involved" with the case because she "didn't want her to be a target of retaliation." Appellant's Brief at 11; Tr. at 251-52.

{¶ 22} Because his counsel did not object to Ms. Slappy's statement or to the prosecutor's question eliciting the statement ("And why don't you want her to be involved?"), Tr. at 251, Mr. Battle has "waived all but plain error" on this score. *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, ¶ 134. Crim.R. 52(B) allows that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." We have observed that "[t]he doctrine of plain error is limited to exceptionally rare cases in which the error, left unobjected to at the trial court, 'rises to the level of challenging the legitimacy of the underlying judicial process itself.' " *State v. Santiago*, 10th Dist. No. 02AP-1094, 2003-Ohio-2877, ¶ 11, quoting *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 122 (1997).

{¶ 23} In the recent formulation of the Supreme Court of Ohio, someone claiming plain error must show a reasonable probability that absent an identified obvious error, " 'the probability of a different result is "sufficient to undermine confidence in the outcome" of the proceeding.' " *State v. Tench,* 156 Ohio St.3d 85, 2018-Ohio-5205, ¶ 217-18, quoting *U.S. v. Benitez*, 542 U.S. 74, 83 (2004) (further citation omitted).

{¶ 24} Attempting to meet this deferential standard, Mr. Battle argues that it was "mandatory" for the trial court to exclude any testimony mentioning "a fear of retaliation for testifying." (Appellant's Brief at 13, invoking Evid.R. 403(A) and its exclusion of relevant evidence the probative value of which "is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.") But there is no automatic and absolute exclusion of evidence that a witness fears retaliation, which evidence may be relevant to issues of credibility and bias. *See State v. Hager,* 10th Dist. No. 93AP-260, 1994

Ohio App. LEXIS 629, at *12 (Feb. 8, 1994); *State v. Hairston*, 10th Dist. No. 01AP-252, 2001 Ohio App. LEXIS 4399, at *10 (Sep. 28, 2001) (questions concerning the reluctance of witnesses to testify or their "fear of harassment" were "relevant and admissible concerning [their] credibility and possible bias"). Ms. Slappy's statement, which did not describe a specific threat of retaliation or mention Mr. Battle, did not amount to unfair prejudice in this context and does not seem reasonably likely potentially to have affected the outcome of the trial.

{¶ 25} We note, furthermore, that Mr. Battle's lawyer had himself initiated the line of questioning that led down this path. Ms. Slappy first mentioned her aversion to having her daughter "involved" when Mr. Battle's counsel successfully elicited testimony (over the objection of the prosecution) that her daughter had identified Redd, but not Battle, as among the group of shooters. Tr. at 250 (Ms. Slappy's testimony, saying, too, that she did not want her daughter "involved in it"). Again, allowing the prosecutor's follow-up did not constitute plain error.

{¶ 26} Second, Mr. Battle argues that the prejudice he suffered from Ms. Slappy's remark was "accentuat[ed]" by the trial court's "discussion to the jury about issuing warrants for the arrest of [the] state's witnesses who had not shown up to testify." Appellant's Brief at 11.

{¶ 27} The first portion of the transcript he cites, *id.*, citing Tr. at 253-54, contains only indirect mention of warrants and made no reference to any reason for witness absences:

> THE COURT: * * * So the State had four other witnesses scheduled and subpoenaed; is that correct?
>
> MR. HUGHES: Yes, Your Honor.
>
> THE COURT: Unfortunately, none of them have shown up. That's the Court's responsibility. We'll take care of that separately. But what it means is the State doesn't have any additional witnesses for you this morning.
>
> The other witnesses that are scheduled, the law enforcement witnesses who I'm very confident will be present, are not scheduled until 1:00 this afternoon.

So I apologize. I've indicated to the State that I will cooperate the best I can, but I'm not going to delay this trial further. We will have the witnesses at 1:00.

Hopefully they can secure the other witnesses. If not, the trial will just proceed without them. We have no choice in the matter.

But I wanted you to understand why all of a sudden there's going to be this void in testimony. It's not due to lack of effort or lack of responsibility by anyone. And I've always believed the jury, to the extent possible, deserves to know everything that I know, so long as it doesn't prejudice anybody. Those are simply the facts of the case.

Tr. at 253-54.

{¶ 28} In the other example to which Mr. Battle points, the judge stated:

Ladies and gentlemen, the State does have two civilian witnesses. One of the ones, as the Court told you, I issued a warrant for. We were able to get a hold of that person, the State was. That person voluntarily has appeared. Depending on how you define "voluntarily," I guess. But they came on their own. They were not arrested, and I have set aside the warrant as I promised I would do.

The second civilian witness was not subject to a warrant at all. They were not served. They are -- but they came down now. So that closes the loop.

The other person who had the warrant, nobody has been able to get in touch with that person, so I don't anticipate that they will be here either voluntarily or involuntarily.

Tr. at 420-21.

{¶ 29} In sum, the trial court mentioned one witness who appeared without a warrant having been issued, one as to whom a warrant had been withdrawn after the witness appeared, and one witness who was not located. Providing the jury this kind of running commentary may be unnecessary or generally not advisable (especially to any extent it may suggest phantom witnesses as to one side of the case or the other), but in the context of this matter we find nothing here from which to conclude that the trial court's remarks, alone or in combination with the other matters complained of, gave rise to any

reasonable probability that they altered the course of the trial; the arguably extraneous explanations did not prejudice Mr. Battle in the context of all the evidence.

{¶ 30} Mr. Battle also criticizes the following remarks made by the prosecutor during closing argument, made after mention of witnesses who did not come to court:

> There's so many 911 calls. You can hear lots of people calling in. They don't want to talk to the police. This is where they live. This is their home. Their home just got hit by a barrage of bullets. They're scared.
>
> When it comes to someone like [young Ms.] Slappy, her mom, Sabrina, says, "She's a minor. I don't want her involved."

Appellant's Brief at 12; Tr. at 650.

{¶ 31} The prosecutor seems to have made these remarks in response to the defense point that Reese Smith (alleged as the victim in one of the felonious assault counts) "never came to court," just as young Ms. Slappy (the alleged victim in another of the felonious assault counts) "did not come to Court * * * * [and] offered no testimony." Tr. at 631 (defense closing); *see also id.* at 624 ("some of these alleged victims * * *, they never bothered to come to court to tell you their story under oath so you could see their demeanor and see whether you find them credible and believable"). As noted above, the mother's desire not to see her daughter involved was brought out in questioning by defense counsel. And the prosecutor's broader point here was that these witnesses' failure to appear in court "doesn't mean [they weren't] there" at the scene, as their presence had been established through other witness testimony. Reese Smith, for example, "was there. He was shot." Tr. at 650 (prosecution closing). That is not an improper point to make in rebuttal.

{¶ 32} We are mindful, too, that the jury then acquitted Mr. Battle on the counts that alleged felonious assaults on Reese Smith and young Ms. Slappy (as well as on her mother). "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). We do not find prosecutorial misconduct here, and, considered in context, these remarks do not appear unduly prejudicial in any event. *See, e.g., State v. Hussein*, 10th Dist. No. 15AP-1093, 2017-Ohio-5519, ¶ 17, citing *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, ¶ 198 (a reviewing court must consider "a prosecutor's closing argument in its entirety to determine whether

the allegedly improper remarks were prejudicial"); *see also State v. Hudson*, 10th Dist. No. 13AP-702, 2014-Ohio-1712, ¶ 17, citing *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, ¶ 94 ("A prosecutor's statements are not to be taken out of context and given their most damaging meaning.").

{¶ 33} Mr. Battle's final due process argument posits that he was unduly prejudiced by testimony about the gun in his car having been stolen from another person some months earlier, about the warrant for his arrest that surfaced during the stop of his vehicle, and about the fact he was driving without a license at that time. Appellant's Brief at 15, 18.  He asserts that these matters, too, constituted plain error as unfairly prejudicial under Evid.R. 403 and amounted to inadmissible character evidence under Evid.R. 404(B), which prohibits the admission of "[e]vidence of other crimes, wrongs or acts * * * to prove the character of a person in order to show action in conformity therewith."

{¶ 34} That rule also states that such evidence "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). Such "other purposes" include investigatory facts. *See State v. Bowden*, 11th Dist. No. 2013-A-0040, 2014-Ohio-158, ¶ 68 ("reference to [defendant's] outstanding misdemeanor warrant" was not impermissible under Evid.R. 404(B) because it "was not proffered as character evidence, but merely to explain his removal from the residence during the investigation"). Here, evidence of the outstanding warrant and Mr. Battle's lack of a valid driver's license formed part of the circumstances of the police investigation and the basis for his arrest. Furthermore, during the testimony regarding the warrant, "nothing was revealed about the specific crime charged," and "[t]here was also no attempt to show appellant acted in conformity with criminal behavior by introducing the evidence of an outstanding warrant." *State v. Warren*, 4th Dist. No. 12CA3324, 2013-Ohio-3542, ¶ 34 (no prejudice under Evid.R. 404(B) or 403(A)). *See also Bowden* at ¶ 68 ("Nothing was revealed about the identity of the underlying charge and [the officer's] testimony was the sole reference to an outstanding warrant").  Again, nothing here rises to the level of plain error.

{¶ 35} And the testimony that the gun Mr. Battle used had been stolen less than half a year earlier called into question his account to police that he'd had the weapon for two years.  The jury was entitled to know those conflicting accounts as it evaluated Mr. Battle's

police interview. *See, e.g., State v. Tribett*, 10th Dist. No. 04AP-828, 2006-Ohio-3437, ¶ 51-52 (jury in assessing defendant's statements made during police interview may consider contrary evidence: "the jury, as the trier of fact, reasonably could find that defendant's credibility was diminished and reasonably could place little weight on defendant's statement to police * * * "). The jury of course was not obligated to believe everything Mr. Battle told police (nor could it have, in light of the inconsistent statements he made that ranged from denying having fired the gun that evening to conceding repeatedly and without qualification that he had). Further, " 'lies told by an accused are admissible evidence of consciousness of guilt, and thus of guilt itself.' " *State v. Brodbeck*, 10th Dist. No. 08AP-134, 2008-Ohio-6961, ¶ 44, quoting *State v. Robinson*, 6th Dist. No. L-06-1182, 2008-Ohio-3498; *see also, e.g., State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, ¶ 54 ("The trier of fact was at liberty to infer consciousness of guilt from [defendant's] lie" to the police during murder investigation). Allowing testimony about the provenance of the gun was entirely appropriate and by no means can be characterized as plain error.

{¶ 36} Having found no merit to Mr. Battle's asserted denial of due process, we overrule the first assignment of error.

{¶ 37} Mr. Battle's second and third assignments of error argue that his convictions, apart from the improper handling count to which he acceded, were not supported by legally sufficient evidence and were against the manifest weight of the evidence. Appellant's Brief at 19-26.

{¶ 38} The jury convicted Mr. Battle of two counts of felonious assault after concluding that he "knowingly * * * cause[d] or attempt[ed] to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A); April 23, 2018 Verdict. Kenya Chandler and Ciera Hampton were named as the victims, and both counts involved a firearm as a deadly weapon. Jury Instructions at 6, 9. Mr. Battle was also convicted of improperly discharging a firearm into a habitation, under the law that prohibits any person from "knowingly * * * discharg[ing] a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual." R.C. 2923.161(A).

{¶ 39} The jury had been instructed on complicity, being advised that Mr. Battle could "be convicted as a principal offender or as a complicitor or an aider and abettor to any and all counts" if he "aided or abetted another in committing the offense with the same

knowledge or purpose as required by the offense under consideration," and that "common purpose * * * may be inferred from circumstances surrounding the act and from the defendant's subsequent conduct."  Tr. at 660-61.  Mr. Battle understandably does not challenge the propriety of that instruction here.

{¶ 40}  In reviewing whether there is legally sufficient evidence to sustain a verdict, " '[t]he relevant inquiry for an appellate court is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Daniels*, 10th Dist. No. 18AP-626, 2019-Ohio-1791, ¶ 9, quoting *State v. McDonaldGlasco*, 10th Dist. No. 17AP-368, 2018-Ohio-1918, ¶ 20 (citations omitted).

{¶ 41}  In assessing a manifest weight challenge, this court " 'may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Daniels* at ¶ 10, quoting *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22 (citation omitted). An appellate court should reverse a conviction as against the manifest weight of the evidence " 'for only the most "exceptional case in which the evidence weighs heavily against the conviction." ' " *Daniels* at ¶ 10, quoting *State v. Reed*, 10th Dist. No. 09AP-84, 2009-Ohio-6900, ¶ 24, quoting *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997).

{¶ 42}  As to both the manifest weight and sufficiency of the evidence challenges, the defense here emphasizes that "there was no testimony that anyone actually saw appellant with a gun," Appellant's Brief at 21 (manifest weight), or that "not one witness identified appellant as having fired a gun," *id.* at 25 (sufficiency), and that there was no evidence showing the direction in which the bullets from Mr. Battle's gun had travelled, *id.* at 21, 25. But Mr. Battle *himself* admitted to the police, repeatedly, that "I did shoot" (and went so far as to say that "[i]f I shot somebody, I'm sorry").  State's Ex. 71.  Viewing the evidence in the light most favorable to the state, we determine that the jury would have been well within its rights to conclude that he put the gun in his own hand and discharged it multiple times, both in actuality at the scene and rhetorically in his confession.  Further, his apologies for

perhaps having shot someone, *see id.* at 39:30; 40:30, as well as other statements such as "[a]fter [his relative nicknamed] 40 shot, I shot," *id.* at 37:43, would further have justified the jury in concluding that he had participated in the shoot-up with the shared requisite criminal intent (even without regard to the particular direction of any particular shot). And the jury could have found that his participation both preceded the actual shooting (in providing the car, for example) and continued afterward (in joining the group in fleeing and in taking control of the car that had been spotted speeding away from the area).

{¶ 43} " 'Aiding and abetting may be shown by both direct and circumstantial evidence, and participation may be inferred from presence, companionship, and conduct before and after the offense is committed,' although the state must show that the defendant had a role in causing the offense." *Daniels*, 2019-Ohio-1791, at ¶ 7, quoting *State v. Hurse*, 10th Dist. No. 14AP-687, 2015-Ohio-2656, ¶ 18, citing *State v. Johnson*, 93 Ohio St.3d 240, 245 (2001), and *State v. Buelow*, 10th Dist. No. 07AP-317, 2007-Ohio-5929. When viewed in the state's favor, the evidence is legally sufficient to satisfy each element of both counts of felonious assault and of the count for improperly discharging a firearm into a habitation. Again, a reasonable jury could have concluded among other things that: Mr. Battle provided the car that brought the group to the scene; by his own admission he fired "three or four shots" during the shoot-up, *see* Tr. at 632 (defense close); bullets flew around and into the dwelling occupied by Ms. Hampton and her four children, striking Mr. Chandler and passing through windows of the house and embedding themselves around the front door and elsewhere; Mr. Battle drove off with the group of shooters; and he wound up behind the wheel of the car in which they had departed and from which his gun was recovered.

{¶ 44} And reviewing the entire record, we cannot say that the jury lost its way and created a manifest miscarriage of justice. "[A] conviction is not against the manifest weight of the evidence simply because the trier of fact chose to believe the prosecution's witnesses and chose not to believe appellant." *State v. Whiteside*, 10th Dist. No. 08AP-602, 2009-Ohio-1893, ¶ 46.

{¶ 45} Because Mr. Battle's convictions were based on legally sufficient evidence and were not against the manifest weight of the evidence, we overrule his second and third assignments of error.

{¶ 46} Having overruled all assignments of error, we affirm the trial court's judgment.  Mr. Battle's convictions stand.

*Judgment affirmed.*

BRUNNER and BEATTY BLUNT, JJ., concur.

_____